### Richmond

## HESTELLE CREWS RICHARDSON

### V.

## HENRY COUNTY DEPARTMENT OF SOCIAL SERVICES

June 18, 1982.

Record No. 811212.

Present: All the Justices.

*Fred D. Smith, Jr.,* for appellant.
*L. Dale McGhee, County Attorney,* for appellee.

COMPTON, J., delivered the opinion of the Court.

In this family law case, a mother contests the action of the trial court that terminated her residual parental rights to three infant daughters.

The children, ages 7, 4 and 3 at the time of the hearing below, were committed to emergency custody of appellee Henry County Department of Social Services in November of 1978. The Department's intervention was prompted by discovery in the emergency room of a Martinsville hospital that one of the children had been abused.

The children were placed in foster care. In July of 1980, the petitions giving rise to this appeal were filed by the Department in the Juvenile and Domestic Relations District Court of Henry County. As to each child, the Department sought "placement in permanent custody with termination of the parents residual rights." Following a hearing and review of a detailed report of the Department, the juvenile court granted the petitions and entered a "Commitment for Adoption" in each case in November of 1980.

The mother of the girls, the father being deceased, appealed the juvenile court orders and filed a motion in the circuit court for custody of her daughters. Upon review of the prior department

report, of a written psychological evaluation of one of the children, of an update to the prior report, and upon consideration of the evidence presented during a January 1981 ore tenus hearing, the circuit judge terminated the mother's residual parental rights. The court ordered that the legal custody of the children be vested in the Department with full authority to place the children for adoption.

Upon appeal, the sole issue is whether the evidence was sufficient to support the trial court's ruling, based on Code § 16.1-283(B).

This is the first case with sufficiency of the evidence the issue that we have decided under subsection (B) since § 16.1-283 was enacted in 1977.* In pertinent part, the subsection provides:

"The residual parental rights of a parent . . . of a child found by the court to be neglected or abused and placed in foster care as a result of . . . court commitment, . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to . . . her life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to . . . her parent . . . within a reasonable period of time.

"Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraph B 2 hereof:

\* \* \*

c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies

---

* For cases decided under subsection (C) of the statute, see *Knox* v. *Lynchburg Div. of Social Serv.*, 223 Va. 213, 288 S.E.2d 399 (1982); *Toombs* v. *Lynchburg Div. of Social Serv.*, 223 Va. 225, 288 S.E.2d 405 (1982); *Harris* v. *Lynchburg Div. of Social Serv.*, 223 Va. 235, 288 S.E.2d 410 (1982); *Weaver* v. *Roanoke Dept. of Human Res.*, 220 Va. 921, 265 S.E.2d 692 (1980). See also *Walker* v. *Dept. of Public Welfare*, 223 Va. 557, 290 S.E.2d 887 (1982).

designed to reduce, eliminate or prevent the neglect or abuse of the child."

The facts are undisputed. The appellant-mother Hestelle Crews Richardson, age 26 at the time of the circuit court hearing, was married in 1972 to Robert Lee Crews when she was age 18, having completed the fourth grade at the age of 16. The children were born to the couple in 1973, 1976 and 1977. During the first part of the marriage, the Crewses lived in a trailer home "beside" his parents. Later, marital problems developed and she went with the children to live with her mother. Crews was never regularly employed and refused to let his wife work.

In January of 1978, Crews was shot and killed by his wife's brother. After her husband's death, the wife lived several months with her mother, sleeping on the floor "on a pallet" with the children. The children's mother then "got involved" with Raymond David Crews, her brother-in-law, and began living with him with the children. For a while during this period she worked at "Nationwide Homes." The couple and the children were being supported in part by Social Security funds being paid monthly to the children for the death of their father. The total monthly amount was nearly $500.

Crews "got along good" with the children and their mother for six or seven months. Then he became irritated because the children were "around" during mealtime. On November 27, 1978, Crews beat the youngest child "for not eating." According to the evidence, Crews believed "the children were supposed to eat as much as he did." The next day, the mother took the child to the Martinsville hospital and gave conflicting accounts of how the extensive bruising evident about the child's buttocks and left leg had occurred.

The child's condition was reported to the Department. The three children were immediately committed to the Department's temporary custody pending a thorough investigation of the circumstances under which the children were living. The other two children had not been abused but the Department found they had been neglected. All three children were dirty, were not properly clothed on the cold November day, were hungry, and "had no stable living situation at that time." It was learned that the social services department of an adjoining county had received complaints about the "family" and the treatment of the children when

they resided there prior to November of 1978. The Henry County Department then began "working with the mother" so the children could be returned to her.

After the children were removed from the mother's custody, she resumed living with Crews at a different location in Henry County. In January of 1979, Crews received a jail sentence upon conviction of abusing the child. After Crews served the sentence, the mother asked the Department "on many occasions" that Crews be permitted to visit the children with her. Then, during February of 1979, the mother advised Crews she "didn't want to have no more to do with him." Shortly thereafter, Crews began threatening her, shooting at her on two occasions.

In March of 1979, the mother married Jesse D. Richardson, who had been married twice before and had one child in each marriage. The validity of the present marriage is doubtful because the first divorce and the second marriage may not be legal.

From April to June, 1979, Richardson was in jail for "nonsupport." From August 1979 to June of 1980, he was incarcerated for arson and shooting into the home of the parents of Raymond Crews, the brother-in-law. During portions of these periods of Richardson's incarceration, the mother resumed seeing Crews and sought to have the Department permit Crews to visit the children. In May of 1979 Crews took her to a Danville hospital. She was sent to the Southern Virginia Mental Health Institute where she remained for almost two months.

During the period from November of 1978, when the Department obtained temporary custody, until December of 1979, the mother "worked really hard" with the Department in an effort to regain custody of the children. She was employed briefly at the "American Furniture Factory" and obtained a place to live separate from her relatives.

The mother's efforts were in response to the provisions of a plan established by the Department to assist the mother, the Department being concerned about the mother's previous instability and the poor living conditions for the children. According to the evidence, the Department made general counseling available to her, directed her to report to the Virginia Employment Commission, discussed vocational rehabilitation with her, gave her mental health counseling, referred her to a legal aid organization for assistance with her legal problems, referred her to the Health De-

partment for medical services, suggested adult education, and provided her rental assistance in locating a place to live.

During this period, the children visited with the mother once each month during January, February, April, July, August and December of 1979. There has been no contact between the mother and children since 1979, except a visit in December of 1980.

From December 1979 to April of 1980, the mother did not contact the Department. She testified that she had changed her living arrangements, apparently moving to adjoining Pittsylvania County, that she had no funds to make long-distance telephone calls, and that she had no means of transportation available. Although many appointments were scheduled, the mother did not meet with a Department representative until May 30, 1980. Because of the mother's apparent lack of interest and because the children became "extremely upset" during the previous visitations, the Department decided to schedule no visitation until the court hearings could be held following institution of this proceeding in July of 1980. Testimony showed that as the result of 1979 visitation with the mother, the children had "temper tantrums, excessive crying for several days, regressing with bedwetting." During the December 1980 visitation, after the juvenile court hearing, two of the children did not recognize their mother initially, "did not get upset, [and] did not react."

At the time of the January 1981 circuit court hearing, the children had adjusted "extremely well" in their foster homes. The oldest child "is a very good student in school." The evidence further showed that Richardson, who has a mental disorder causing him to be "extremely nervous at times," was employed as a truck driver at a salary of about $130 per week. He also receives about $150 per month for a military disability received in Vietnam. Richardson is required to pay over $200 per month support for the children of his previous marriages and was $4455 in arrears as of April 1979.

At the time of the hearing, the mother was unemployed and living with Richardson in his Henry County home near Irisburg. While the house has four rooms, it has "no running water, no plumbing and an out house is in the back."

■ Although during comments from the bench following the hearing the trial judge referred to subsection (C) of the statute, we are satisfied the court based the decision on subsection (B). This is because the provisions of the final order, entered about

four months later, track the language of subsection (B). The court found by clear and convincing evidence that the infants are neglected children; that it is in their best interest for the mother's residual parental rights to be terminated; "that the neglect suffered by these children presents a substantial threat to their life, health and development, and it is not reasonably likely that the conditions which resulted in such neglect can be substantially corrected or eliminated as [to] allow the children's safe return to their mother; [and] that the mother has not responded to or followed through with appropriate, available, and reasonable rehabilitative efforts on the part of social, medical, mental health, or other rehabilitative agencies designed to reduce, eliminate, and prevent the neglect of the children."

On appeal, the mother directs much of her argument to subsection (C) of the statute. This is irrelevant in view of the trial court's explicit holding based on (B) in the final order. Addressing subsection (B), the mother argues the evidence was insufficient because the Department offered no proof to rebut her testimony that she had ceased association with Crews, the individual "who caused her to lose custody of her children initially." She also argues the Department introduced no evidence that she "failed, without good cause, to comply with their guidelines for regaining custody." She contends the record is silent on a specific plan established by the Department and that, while she was referred to several agencies, the planning was left to her. We disagree.

Referring to subsection (B), we see there is no controversy about sufficiency of the proof of certain statutory requisites. The mother does not attack the findings that the children were neglected and that such neglect presents a serious and substantial threat to their lives, health or development. Indeed, except by inference, she does not even dispute that the best interests of the children will be served by terminating her parental rights. She only argues that the proof fails to show that it is not reasonably likely the condition which resulted in the neglect can be corrected within a reasonable time, because there is no showing she has unjustifiably failed to respond to the rehabilitation efforts of the Department. The evidence clearly and convincingly demonstrates otherwise.

In comments from the bench following the hearing, the trial judge emphasized the mother's unwillingness to create any stability in her life and to make any adequate plans to, within a reason-

able time, provide a suitable home environment for her children. The court pointed out that at the time of the hearing, held over two years after the children had been removed from her custody, the mother was actually in a worse position to provide a proper environment for the children than she had been in 1978. We agree with this assessment of the evidence.

The neglect of the children grew out of the mother's transient, nomadic, unstable conduct, combined with her unwise selection of male companionship. The evidence shows that situation has not changed. The record establishes the Department was diligent in offering the mother a wide range of planned rehabilitative services designed to aid her in improving the conditions that brought about the neglect. She cooperated with the Department for a year but then failed to make any further effort, using as the excuse that she could not afford telephone calls to an adjoining county and had no means of transportation. A mother who had a sincere desire to maintain contact with and retain the right to her children would not be deterred by such minor obstacles, especially when the mails were available for communication to one who, as here, is able to read and write. In addition, even during the period she maintained contact with the Department, she sought repeatedly to inject into the visitation routine the very person, Crews, who was the abuser of one of her children. Moreover, even while she did not have the responsibility of caring for the children, the mother had no regular employment.

In sum, the Department established that the mother, without good cause, failed to respond to their rehabilitative efforts. Under the statute, this is prima facie evidence of the conditions set forth in subparagraph (B)(2) of the statute. Consequently, and because the mother did not go forward with sufficient evidence to the contrary, the requirements of (B)(2) have been proven, that is, it is not reasonably likely that the conditions which resulted in the neglect can be substantially corrected or eliminated so as to allow the children's safe return to the mother within a reasonable time.

For these reasons, and because it is in the best interests of these children, we hold the trial court correctly terminated the mother's residual parental rights. Accordingly, the judgment appealed from will be

*Affirmed.*

RUSSELL, J., dissenting.

The commitment of the children to the temporary custody of the Department in November 1978 was justified by the evidence of child abuse by Crews, and the neglected condition of the children while the mother lived with him. However, the mother thereafter "worked really hard" with the Department to regain custody of her children, married Richardson and ended her association with Crews. She testified that she complied with every suggestion the Department made. In December 1979 the Department's caseworker was "feeling very confident that she [the mother] would get the kids back."

The Department's attitude toward her changed when it lost contact with her for the first four months of 1980. During this time Richardson was incarcerated. The mother was unable to find work and was forced to live in conditions of great poverty with a sister in Pittsylvania County. She testified that she had no money, had no access to a car, and that her sister refused to drive her to Martinsville. "Every time I would go to borrow a phone from somebody they'd say I'd run their bill up and I wasn't working, and I wouldn't pay for it." Although she was unable to make the necessary long distance calls, she did write a letter to the Department asking for an appointment. When this was arranged, she was unable to keep it because her sister "let on like she didn't have no gas and the car wouldn't crank."

The Department evidently rejected these explanations and filed petitions for termination of parental rights. Thereafter it was relatively easy for the Department to present evidence adverse to the mother, e.g., (1) the children were at first upset by her visitations but, as time passed, the younger two no longer recognized her, (2) the children were doing "extremely well" in foster homes, and (3) she is still poor and unemployed, and lives with Richardson in a house which lacks running water.

These cases have a way of developing a tragic momentum of their own. No doubt the Department found good foster homes for the children in which they would adjust well, with the passage of time. It is also not surprising that visitations with their mother would at first upset them, and later become meaningless if their separation from her were sufficiently protracted. For all of this we have only the delays of litigation to blame. These children have now been away from their mother for over three and one-half

years. The longer the separation lasts, the more insistent such evidence becomes.

The mother's relative poverty and fourth-grade education, contributing to her limited employment opportunities, go no further to disqualify her as a parent than does her home's lack of running water. We have not reached a point where the State may take over the children of those who have the misfortune to be poor.

The problems giving rise to the original custody placement were resolved. This case turns on whether the mother failed, "without good cause, . . . to follow through with appropriate, available and reasonable rehabilitative efforts" proposed by the Department, and whether the termination of parental rights is "in the best interests of the child[ren]." Code § 16.1-283(B)(2)(c). The Department has the burden of establishing these matters by "clear and convincing evidence." *Id.* I think it failed to do so. *See also: Santosky* v. *Kramer*, 455 U.S. 745 (1982).

I would reverse and remand for retrial in light of the conditions found to exist at the time of retrial.

POFF and STEPHENSON, JJ., join in dissent.