### Richmond

VESTER DEAHL AND DOTTIE DEAHL

v.

WINCHESTER DEPARTMENT
OF SOCIAL SERVICES

January 21, 1983.

Record No. 820042.

Present: All the Justices.

*Jeffrey L. Milam (Hoover, Hoover, Penrod & Davenport,* on brief), for appellants.
*Bruce E. Downing* for appellee.

THOMPSON, J., delivered the opinion of the Court.

Vester and Dottie Deahl are the natural parents of Jack Warren Deahl, born November 11, 1967. Upon petition of the Winchester Department of Social Services (Department) and pursuant to Code § 16.1-283, the trial court terminated the Deahls' residual parental rights in their son. This appeal followed.

The essential facts, as outlined in the Department's reports and a circuit court decree dated November 18, 1980, are:

On August 28, 1978, Jack, the eldest of three children, was removed from the Deahl home because of parental abuse and placed in the Department's emergency custody. On September 8, 1978, the juvenile court ordered that Jack remain in the custody and care of the Department. Over the next nine months, Jack responded well to foster placements; the Deahls were offered extensive rehabilitative services, including counseling, psychological assistance, and a parental skills training program. Then, at the recommendation of the Department, the juvenile court, on June 15, 1979, returned Jack to his parents. Six months of supervision by the Department followed.

While in the custody of his parents, Jack's situation again deteriorated. After mid-September, 1979, the Deahls refused to take Jack to his psychologist for his weekly counseling sessions, in spite of being reminded of the order of the juvenile court to that effect. In the presence of other adults, the parents criticized Jack's progress, despite repeated assurances from school personnel that Jack's school performance was satisfactory. Offers of assistance from school personnel were spurned, as were numerous opportunities for alternative treatment for Jack. Instead, the Deahls chose to take their son to West Virginia for testing and then refused to disclose the nature and the results of the tests.

On the morning of October 24, 1979, Deahl learned from Jack the youth's intention not to come home after school that day, but took no immediate action to insure Jack's safe return. The Deahls did later report Jack's running away and assisted in a subsequent search. It was only at the suggestion of Jack's principal, however, that Deahl agreed to pick up his son at school every afternoon. Then, on November 16, 1979, Deahl told the school authorities that it was their responsibility to see that the youth returned home after each school day, and abruptly discontinued picking up Jack.

Three days later, Jack again failed to go home after school and was found by the police wandering on the streets of Winchester late that evening. Jack at that time stated to an official of the juvenile court that, given a choice, he did not want to return home. Because of emotional and physical parental abuse, Jack was returned to the custody of the Department a second time, and has remained there ever since.

From November, 1979, until late May, 1980, the Deahls had no contact with Jack. In contrast to when he was in the custody of his parents, during this period Jack adjusted well to his foster homes, performed adequately at school, and regularly returned to the homes without incident. Visitation with Jack was offered by the Department to his parents provided that the parents would discuss Jack's situation, disclose the nature and location of the earlier West Virginia treatments, and agree that all visitations would be supervised by the Department. The Deahls refused these terms and conditions. It was not until April, 1980, that they sought court-approved visitation rights.

On February 8, 1980, the juvenile court found Jack to be "a child in need of services" under Code § 16.1-228, and ordered that care and custody remain with the Department. In March, 1980, the court approved supervised visitation, provided that it was at the discretion of the Department with Jack's consent. The Department then informed the Deahls that their son had requested that there be no visitation. On May 12, 1980, the juvenile court ordered visitation under terms similar to those originally proposed by the Department.

During the summer of 1980, Deahl made a number of unauthorized contacts with his son, which greatly upset the youth. In fact, on one such occasion, Jack was told that if he did not tell the Department that he wanted to return home, the family would move away and leave Jack to be adopted.

Jack mysteriously disappeared for four weeks in August, 1980. His explanation was that he hitchhiked alone to West Virginia and stayed with family friends without the knowledge of his parents. Deahl, on the other hand, explained that Jack stayed with nearby relatives who failed to notify him of this fact for some time. Deahl offered no corroborative evidence from such relatives to support this explanation despite the opportunity to do so. Deahl also testified that even though he knew Jack had not been located, he and his wife took a three-week vacation in North Carolina. This was contradicted by evidence that Deahl was seen in Winchester on several occasions during the three-week period.

After Jack returned, he was moved to a group home in Harrisonburg which he liked very much. In the appeal of the February 8, 1980, juvenile court decree, the circuit court ordered that Jack remain in the Department's custody. In this decree, dated November 18, 1980, the court made extensive findings of fact before concluding that Jack was a "child in need of services."

The Harrisonburg group home was closed for financial reasons on March 6, 1981, and the Department returned Jack to the Winchester area. As he was riding toward Winchester, Jack became very agitated, stating that he did not wish to come back because he was afraid. Once in Winchester, Jack became very depressed and withdrawn, not wanting to leave the group home during his free time. He became quite upset after an incident where he was alone on a city bus and saw his father on a city street. In late April, 1981, Jack stated that he was afraid to meet either his mother or his father.

On April 29, 1981, the Department moved for termination of the residual parental rights of the Deahls in their son, alleging that the youth had been neglected and abused; that this presented a serious threat to his health and development; and that it was not likely that the conditions which resulted in this abuse could be corrected or eliminated so as to allow Jack's safe return to his parents within a reasonable period of time. In their grounds of defense, the Deahls denied the Department's allegations and further averred that there had never been a determination that they were guilty of neglect or abuse; that they tried unsuccessfully for several years to exercise their visitation privileges; that pursuant to a circuit court order they had visited with Jack in September and October, 1980; and that the Department had been totally uncooperative in scheduling visitation with Jack.

On July 17, 1981, the juvenile court terminated the Deahls' parental rights. The termination order stated that Jack, in chambers with counsel, requested termination and that the guardian ad litem concurred. The Deahls appealed to the circuit court.

In early October, 1981, several days before the hearing, the Deahls visited with Jack for the first time in almost a year.

In a series of pretrial motions, the Deahls requested the judge recuse himself, that their counsel be discharged, and that a continuance be granted. All motions were denied by the court. On October 6, 1981, the circuit court hearing was held. Jack, his guardian ad litem, witnesses for the Department, and counsel for the Department and the Deahls were present. The Deahls did not attend. Their attorney explained that Deahl had stayed home with his wife who was sick and unable to attend. Once again, Deahls' attorney renewed motions for a continuance and a request for withdrawal as counsel, both of which were denied.

On the day of the hearing, Jack was 36 days away from his fourteenth birthday. At the request of the Department and the guardian ad litem, but over the objection of the Deahls' attorney, the court refused to allow Jack to be asked whether he wanted the rights of his parents terminated. The court reasoned:

> Here is the thing that concerns me. I want you to have all the rights that you should have, but I don't think it is advisable for this boy to force you to say to to this boy, "Jack, do you want to be taken out of the custody of your parents and put with the Welfare?" To me, that is a very damaging thing to ask anyone. I mean, he may want that but he is not going to want to say it or he may say it and then just live with a lifetime on that thing.
>
> It seems to me you have got to try to secure by indirection what you are after and I think the best thing you can do is ask him how he is doing, what his interest is, and so forth. But, I do not want you to ask him to make the choice for himself.
>
> . . . .
>
> How old is he now? Thirteen, going on fourteen? . . . .
>
> . . . . All right. I don't think I will permit you to ask him the ultimate question.

How would you all want to do it? Want to let counsel examine him just sort of casually. I think that would be the best way.

Jack was examined extensively by his guardian ad litem and counsel for the Deahls and the Department as to his desires and feelings concerning his parents. At the outset, he was asked by the court whether he preferred making a statement or merely answering questions. Jack chose the latter and testified that his most recent visit with his parents the week earlier had been a good visit; that his parents now seemed more concerned about how he was doing; that some of the prior visits were good and some were not "so hot;" that his father and the social worker got into arguments during several of the scheduled visitations; that he missed and loved his parents; and that considering the last visit, he would ultimately like to return home on a permanent basis. When asked whether he wanted to tell the court about the way he would like the relationship with his parents to be, the youth responded that he felt the relationship was improving from what it had been previously.

Ed Shuster, the Department employee who accompanied Jack at the visit with his parents in October, 1981, told how in conversations before the visit Jack had told him that he wished to tell his parents that he was tired of being blamed for everything; that he wished to be treated as his sisters were being treated; and that he wished his parents would see somebody to talk about their problems. Jack did not give his planned presentation at the visit; when later asked why he had changed his mind, Jack explained that the visit had been so happy that he didn't want to upset it by discussing this particular subject with his parents.

Suzanne Grubbs, the Department supervisor, corroborated Shuster's testimony as to what Jack told them he wanted to tell his parents at the October, 1981, visit. She testified that before the visit Jack volunteered that it was a natural pattern that when he comes to a court hearing he gets in trouble afterwards. On one occasion, he was picked up for shoplifting and on another he was suspended from school for writing notes. She described how at the court-ordered visitations Deahl would threaten the supervising social workers. In fact, Grubbs testified that Deahl had on several occasions stalked her as she left work.

When asked why the Department had made no effort to contact the Deahls between November, 1980, and October, 1981, Grubbs responded that the Department felt that it had provided sufficient services to the Deahls; that every service available in Winchester to unite this family had already been tried; that since the Deahls had been so resistive and uncooperative there was not a whole lot the Department could do; that the Deahls did not seem to believe that they had any problems that needed to be corrected; and that she did not want to subject any of her workers to these types of threats and conduct. She also explained that the reason the Deahls had not been put through the parental skills program a second time was because they had been through it once and the counselor felt that they should not be allowed to go through it again with their present attitude. Grubbs concluded that she would make every effort for her social workers to provide services to the Deahls if they would cooperate. She opined that it was in Jack's best interest that his parents' parental rights be terminated so that he would have some permanent idea of what would happen to him and would be prevented from having any fear that he would have to return home to his family.

After extensive testimony and argument, the court terminated the Deahls' parental rights under Code § 16.1-283(B) and (C)(2)[1]

---

[1] Code § 16.1-283(B) and (C)(2) state in pertinent part:

B. The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1. The neglect or abuse suffered by such child presented a serious and substantial threat to his or her life, health or development; and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his or her parent or parents within a reasonable period of time.

Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraph B 2 hereof:

. . . .

c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child.

C. The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

. . . .

and memorialized its decision in a final order dated October 10, 1981.

On appeal, the Deahls assign the following errors: (1) the trial judge should have recused himself, (2) the evidence was insufficient to terminate parental rights under Code § 16.1-283, and (3) the trial court erred in not allowing Jack to be asked whether he wanted his parents' parental rights terminated.[2]

## I. *Recusal of the trial judge.*

The Deahls contend that the trial judge erred in failing to recuse himself from the bench in this case. They argue that because he had previously presided over proceedings concerning the custody of Jack and may have based his decision here on his recollection of testimony from these trials, he was biased against them. We disagree.

We have consistently held that a trial judge must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny a party a fair trial. *Justus* v. *Commonwealth,* 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981); *accord, Slayton* v. *Commonwealth,* 185 Va. 371, 376, 38 S.E.2d 485, 488 (1946). "Merely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings . . . does not

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subparagraph . . . 2 hereof:

. . . .

b. The parent or parents, without good cause, have failed or have been unable to make reasonable progress towards the elimination of the conditions which led to the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a social, medical, mental health or other rehabilitative agency.

[2] On brief, the Deahls also complain that an express finding of parental unfitness is required in termination proceedings, and that Code § 16.1-283 is violative of the United States and Virginia Constitutions. As the Deahls conceded in oral argument, we have rejected both contentions in recent cases. *Knox* v. *Lynchburg Div. of Social Serv.,* 223 Va. 213, 288 S.E.2d 399 (1982); *Toombs* v. *Lynchburg Div. of Social Serv.,* 223 Va. 225, 288 S.E.2d 405 (1982); and *Harris* v. *Lynchburg Div. of Social Serv.,* 223 Va. 235, 288 S.E.2d 410 (1982).

automatically or inferentially raise the issue of bias." *Barry* v. *Sigler,* 373 F.2d 835, 836 (8th Cir. 1967).

From our reading of the record, we cannot say that the trial judge abused his discretion in refusing to recuse himself.

## II.  *Sufficiency of the evidence.*

■ The Deahls also complain that the order terminating their parental rights was unsupported by the clear and convincing evidence required by Code § 16.1-283(B) and (C)(2). Specifically, they argue that under subsection (B), no determination of neglect or abuse presenting a threat to Jack was ever made; that it was never established that the situation would not improve within a reasonable period of time; and that termination would not be in Jack's best interests. Also, under subsection (C)(2), their alleged failure to respond to rehabiltative services offered by the Department was never proven.

We reject each of these contentions and hold that the evidence was sufficient to satisfy the requirements for termination under both Code §§ 16.1-283(B) and (C)(2). As to subsection (B), the record shows countless incidents of parental abuse of Jack. Further, considering the past attitude of the Deahls towards both Jack and the Department, there is little likelihood that the condition which resulted in the abuse or neglect will improve so as to allow Jack to return to the Deahl home within a reasonable period of time. Lastly, from the evidence before it, the court should easily conclude that termination is in Jack's best interest. *See Richardson* v. *Dept. of Soc. Serv.,* 223 Va. 670, 292 S.E.2d 342 (1982). Likewise, the record is replete with evidence proving the elements of subsection (C)(2). The Department clearly offered "reasonable and appropriate" rehabilitative services which the Deahls consistently rejected. In fact, the testimony reveals that despite being offered *every* service available in the Winchester area to reunite their family, the Deahls made no progress in remedying their situation. *See also Knox* v. *Lynchburg Div. of Social Serv., supra; Harris* v. *Lynchburg Div. of Social Serv., supra; cf. Weaver* v. *Roanoke Dept. of Human Res.,* 220 Va. 921, 265 S.E.2d 692 (1980).

### III. *The "Child Preference Clause" and examination of Jack.*

The Deahls challenge the trial court's ruling that Jack could not be asked whether he approved of the termination. Pointing to Code § 16.1-283(E),[3] they submit that since Jack was almost 14, he should have had some input in determining his future. In the alternative, they argue that the trial court should have granted their motion for continuance, waited until Jack reached his 14th birthday, and allowed him to determine his fate. They further note that if the trial court felt the youth was incapable of testifying because of his age or some other reason, he should not have been permitted to testify on any matter.

The Deparment replies that the court acted within its discretion in allowing Jack to testify to everything but his views on the termination. It states that before deciding to limit the examination of Jack the trial court properly considered such factors as potential

---

[3] Code § 16.1-283(E) provides in pertinent part that "residual parental rights shall not be terminated if it is established that the child, if he . . . be fourteen years of age or older *or otherwise of an age of discretion as determined by the court,* objects to such termination." (Emphasis added.)

Statutes containing this provision have been labeled "Child Preference Clauses." Comment, *Termination of Parental Rights — An Analysis of Virginia's Statute,* 15 U. Rich. L. Rev. 213 (1980). In IJA-ABA Joint Commission on Juvenile Justice Standards, *Standards Relating to Abuse and Neglect* (tentative draft) § 8.4 at 157-58, 161 (1977), the Commission provided:

8.4 Situations in which termination should not be ordered.

. . . .

E. a child over age ten objects to termination.

*Commentary*

. . . .

*Children ten and over.* The final exception provides that termination should not be permissible when a child of ten objects to termination. The standard reflects the conviction that children should be given a substantial say in decisions affecting their lives, in accordance with their capacity to exercise judgment.

The choice of any particular age is somewhat arbitrary, since there is little psychological evidence available to guide one in making this choice. The specific choice of ten reflects the judgment that children of this age have sufficient maturity to understand the decision and probably desire control over such decisions. If a child this age opposes termination, he/she may defeat efforts to provide him/her a stable, permanent environment. In addition, it is considerably more difficult to find permanent homes for children over this age, so termination may deprive them of any "parents."

Other possible ages are twelve or fourteen, the two most common ages at which children now are given the right to consent to adoption, choose ther own guardians, and choose a custodian in a divorce dispute.

damaging effect the question would have on this youth, his possible reluctance to concur in the termination in front of others, and the advice of Jack's guardian ad litem.

Code § 16.1-283(E) explicitly states that when the court determines that a child less than 14 years of age is "otherwise at an age of discretion," the youth's objection to termination will bar further proceedings. Here, the record is silent as to whether the trial court made a threshold determination whether Jack was at the "age of discretion." Instead, the court refused to allow Jack to be asked the "ultimate question," while going ahead and allowing counsel to secure "by indirection" Jack's wishes as to his termination.

The statute does not define "age of discretion."[4] By analogy, we examine that phrase in child custody cases. In *Hepler* v. *Hepler,* 195 Va. 611, 620-21, 79 S.E.2d 652, 658 (1954), we said:

> Where . . . [the] child has reached the age of discretion, his wishes should be considered and given weight, though they are not conclusive. [Citations omitted.]
>
> In *Nelson* v. *Nelson,* 260 P.(2d) 886, 887, it is said, "The rule is that when children have reached an age of discretion, their wishes on the issue of custody may be considered but are not controlling *** And as to what is an age of discretion in this regard (note the qualifying words), the authorities hold that the test is whether the child is sufficiently mature to have intelligent views and wishes on the subject."

Later, in *Addison* v. *Addison,* 210 Va. 104, 109, 168 S.E.2d 281, 284 (1969), a child custody controversy growing out of a divorce suit, we said:

> We have here two children . . . who will soon be 16 years old . . . and . . . 13 years old . . . . Manifestly we are no longer dealing with very young children, but with teenagers whose wishes and attitudes should not be disregarded, and whose opinions are entitled to weight.

---

[4] *Webster's Third New International Dictionary* 41 (3d ed. 1981) defines "age of discretion" as "the age at which the law imputes to a person the possession of sufficient knowledge for him to become responsible for certain acts or competent to exercise certain powers."

We think that the definition of the "age of discretion" as approved in *Hepler* should be applied here. We fully appreciate the commendable efforts of the trial court to shield this youth from the realities of a hard choice made from the witness stand, but we do not think the ruling meets the requirements of the statute.

As we construe the statute, the child must be afforded a meaningful opportunity to object if he is 14 or over or has attained the "age of discretion." The trial judge is uniquely qualified to appraise the effect of interrogation in each individual setting, including psychological and emotional factors. We are content to leave to his judicial discretion the methods of approaching and resolving this ultimate issue. In the record before us, a strong argument can be made that this child objected to termination and that the lower court ignored his sentiments. The trial record should be devoid of any possible ambiguities on this point. In this case the trial judge should have determined whether Jack was of the "age of discretion" and, if so, whether he objected to the termination, and the court order should reflect these findings. It may not always be necessary that the bald question be propounded to the child provided the record otherwise clearly indicates the child's wishes. This judgment does not meet that standard; therefore, we reverse it.

The decree of the trial court will be reversed and the case remanded to that court for the procedure required under Code § 16.1-283(E).

*Reversed and remanded.*

COMPTON, J., dissenting in part.

Referring to section III of the opinion, I disagree with the majority's treatment of that portion of Code § 16.1-283(E) providing that residual parental rights shall not be terminated "if it is established that the child . . . objects to such termination."

As I understand the majority's decision on the so-called "child preference clause," the trial court, in the exercise of sound judicial discretion, may refuse to require the child to testify about whether he objects to the proposed termination of residual parental rights. I agree with that principle.

Parenthetically, I do not understand the quantum of proof the majority requires to "establish" the child's objection; they say "a

strong argument can be made" that the child objected and that the record "should be *devoid* of *any possible* ambiguities on this point" (emphasis added). Does this mean the objection of the child must be demonstrated by slight evidence, by a preponderance of the evidence, by clear and convincing evidence or beyond a reasonable doubt? I am unable to discern a clear answer to this question. I would require the fact of objection to be "established" by a preponderance of the evidence.

Casting the foregoing ambiguity aside, I would affirm the judgment below. I approve of the trial judge's action in refusing further to inject the child into the center of this bitter controversy by forcing him to testify about his preference, and I believe the record fails to "establish," whatever the criterion used, that the child objects to the termination of the parents' residual parental rights.