COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Kelsey and Senior Judge Overton


DEPARTMENT OF SOCIAL SERVICES
 FOR THE COUNTY OF CAMPBELL, VIRGINIA

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 0416-04-3            JUDGE ROSEMARIE ANNUNZIATA
                                                    OCTOBER 12, 2004
JEROME WOODRUFF AND
 REBECCA WOODRUFF


FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
J.S. Johnston, Judge

        (David W. Shreve, County Attorney, on brief), for appellant.
        Appellant submitting on brief.

        (Curtis L. Thornhill; James J. Angel, on brief), for appellees Jerome
        Woodruff and Rebecca Woodruff, respectively.  Appellees
        submitting on brief.

        (Grady W. Donaldson, Jr.; Schenkel & Donaldson, P.C., on brief),
        Guardian *ad litem* for the minor children.  Guardian *ad litem*
        submitting on brief.


        The Department of Social Services for the County of Campbell, Virginia, (DSS) appeals

from the circuit court's denial of its petition to terminate the parental rights of Jerome Woodruff

(father) and Rebecca Woodruff (mother) with respect to their four minor children.  DSS contends

that the circuit court erred as a matter of law because it applied an incorrect standard to its review

of the evidence.[1]  For the following reasons, we reverse the circuit court's decision and remand

for further proceedings consistent with this opinion.

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] The children's guardian *ad litem*, who was served proper notice of this appeal,
submitted a brief supporting DSS's position that the circuit erred because it applied an incorrect
standard to its review of the evidence.

# I. Procedural Background

Mother and father are the parents of four minor children: K.S., born January 11, 1998; K.L., born October 30, 2001; and twins K.A. and K.N, born February 27, 2003.

Due to the parents' inability to maintain adequate housing, DSS filed a petition seeking a protective order with respect to the parents' oldest children, K.S and K.L., on October 24, 2002. The protective order was entered on October 30, 2002, and custody of K.S. and K.L. was transferred to DSS on January 3, 2003. On March 3, 2003, the twins, KA. and K.N., were removed from the parents' home and placed in the custody of DSS pursuant to an emergency removal order. Foster care plans with the goal of "return home" were approved on March 11, 2003 with respect to K.S. and K.L. and on May 13, 2003 with respect to the twins.

DSS filed petitions in the juvenile and domestic relations district court to terminate parental rights with respect to all the children on August 22, 2003. The orders granting the petitions were entered on September 30, 2003. Those orders were appealed to the circuit court, and the matter was heard on January 5, 2004. The circuit court denied the petitions by order dated February 10, 2004. This appeal followed.

# II. Factual Background

At the circuit court hearing, DSS presented evidence establishing that mother and father consistently failed to maintain employment or suitable housing and failed to take advantage of the department's efforts to rehabilitate them. The record established that DSS began working with the family in 1998. In March of 1998, Mary Caldwell, an Employment Services Worker for DSS, enrolled the parents in the Temporary Assistance for Needy Families (TANF) program. The TANF program requires that the enrolled parent participate in a work program designed to have the parent employed by the time the TANF benefits expire, two years from entry into the program. Father was never able to obtain employment. Although mother obtained two jobs

between 1998 and 2000, she remained employed for only one month in each job. Mother left each job because "she got mad with somebody[,] . . . didn't have a ride[,] or didn't have clothes to wear." Caldwell testified that mother had no "legitimate" reason to leave her jobs because DSS provided her with clothes and often provided her with transportation. Caldwell further stated that, while enrolled in the TANF program, both parents had their benefits temporarily suspended for failure to meet program requirements.[2]

In 1998, DSS also began working with the parents to obtain housing. Tonya Lindsey, a social worker with the "Section Eight Housing Unit" of DSS, testified that she obtained a Section Eight housing voucher for the Woodruffs in September 1998, entitling them to a two-bedroom apartment of their choice. The Woodruffs lived in the English Apartments complex in Altavista for two years. However, the property manager refused to renew their lease after two years because the parents were "not very good housekeepers" and frequently bothered "other tenants by going door to door asking for . . . monetary donations [and] borrowing things [without] . . . returning them." The Woodruffs then moved to another apartment on Park Street in Altavista and stayed there for approximately two years. Water service to the Park Street apartment was discontinued twice and electricity was disconnected for four months because the Woodruffs failed to pay the bills despite receiving a utility stipend from DSS and a rent subsidy. DSS told the parents that it would move to terminate the Section Eight assistance if they did not have the electricity reconnected. Electricity was restored to the apartment for a time, but it was again disconnected after the parents illegally bypassed their electricity meter.[3]

---

[2] Mother missed an "appointment," and father failed to attend a required class.

[3] Lindsey testified that the electric company disconnected the electricity "from the pole" so that the parents would "not . . . attempt to do something that dangerous again."

Due to their failure to maintain the utilities, Lindsey moved to terminate Section Eight housing assistance to the parents. The parents requested an informal hearing, which was scheduled for April 11, 2002. The parents failed to attend the hearing, however.[4] Their benefits under Section Eight were accordingly terminated, and they were forced to move from their Park Street apartment.

Although DSS offered to place K.S. and K.L. in alternative homes or with relatives until the parents found housing, the parents refused. They stayed at various hotels from April to May 2002, paying for the lodging with assistance from various churches that helped them based on their claim that they lost their house in a tornado.

Both parents were arrested in July 2002 on outstanding felony warrants and were jailed from July 2002 to September 2002. While in jail, the children's grandmother took K.S. and K.L. into her care. When the parents were released from jail in September 2002, they retrieved K.S. and K.L. and moved into a hotel and then to a house on Village Highway in Rustburg.

While the parents stayed in a hotel following their release from jail, a Child Protective Services complaint was lodged against them. As a result, DSS sought a protective order in October 2002. The protective order ordered the parents to find employment and safe housing, and DSS offered services designed to help the parents comply with the order. Gala Shelborne, a social worker for DSS, testified that she provided the parents job referrals, housing referrals, transportation assistance, food baskets, diapers, other household needs, and psychological appointments. Despite the assistance of DSS, the parents failed to keep appointments, failed to obtain employment, and failed to maintain suitable housing.

---

[4] Lindsey testified that, after the parents failed to appear for the hearing, she and another social worker "went out to seek the family" on April 11, 2002. They discovered the parents in Altavista "strolling down Main Street pushing the child in a baby carriage so that kind of made it clear that the priority was not in resolving the issue."

Shelborne and Carol Anne Booth, another DSS social worker, testified as to the conditions in the house on Village Highway and discussed what photographs of the house depicted.[5] The house, a cinderblock dwelling, had no indoor plumbing except for the kitchen sink. There was no source of hot water. Cloth hanging from the ceiling separated the structure into rooms. Clothing was strewn on the floor, and the house was extremely cluttered. Water leaked through a hole in the ceiling in the den and onto the clothes left on the floor; every room, in fact, had a hole in the ceiling. A side room was used as a bathroom and a bucket was used as a toilet; the bucket was emptied somewhere outdoors. The house had an exposed fuse box, a light switch with exposed wires, and an unprotected wood stove. A very strong odor of urine permeated the house, and a knife and condom were seen lying on the floor. The Virginia Department of Health wrote the parents a letter which ordered them to vacate the building "[d]ue to the high risk of disease transmission" inherent in having "no bathroom or other approved method of human waste disposal."

Booth testified that she suggested to the parents that they move into a shelter so that they could save money while looking for work. Both parents refused to move to a shelter. K.S and K.L. were subsequently removed from the home in January 2003; K.A. and K.N. were removed shortly after their birth in March 2003. The parents were allowed supervised visitation with their children.

In January 2003, DSS began looking for other houses for the Woodruffs and worked with the parents on their budgeting skills. The parents failed to attend psychological evaluations which were scheduled for the family on April 16, 2003. The parents failed to attend the rescheduled evaluation appointment on July 23, 2003 as well. The parents never attended parenting classes at DSS despite residing within walking distance, and they failed to attend anger

---

[5] The photographs were admitted into evidence.

management classes as directed by a juvenile and domestic relations district court order. DSS gave the parents bus vouchers for a three-month period so that they could look for employment. DSS also gave the parents vouchers to purchase clothing when mother informed Booth that she obtained a job, but the vouchers were used for items other than clothing. Booth learned later that mother never obtained a job.

Crystal Roach, a social worker for Comprehensive Family Services in DSS, testified that she went to nine different locations to obtain employment applications for father in February 2003, which she delivered to him for him to fill out. She later transported father to twelve different locations so that he could apply for jobs. The efforts proved fruitless; father never obtained a job.

In April 2003, DSS and the parents entered into a "foster care contract" outlining the parents' responsibilities and the services DSS would provide. The parents agreed to comply with all of DSS's recommendations; to attend psychological evaluations and counseling; to follow the psychologist's recommendations; to locate, obtain, and maintain stable employment; to locate, obtain, and maintain stable and safe housing; to provide essential items, such as diapers and baby formula, for their children; to learn budgeting skills; to attend parenting classes; and to attend visitation with the children. In addition, mother agreed to attend counseling, and father agreed to attend anger management classes as ordered by the juvenile and domestic relations district court. In turn, DSS agreed to maintain contact with the Woodruffs on a weekly basis; to provide three months of free bus transportation; to pay for the psychological evaluations; to pay the first two weeks rent of an efficiency apartment; to pay for parenting classes; and to provide visitation with their children. Many of these services had also been provided in the past.

Roach testified that, with the exception of visiting their children, the parents failed to achieve any of the goals or to meet any of their responsibilities under the agreement. Booth

further testified that none of the goals in the foster care service plan were met; to wit, the parents failed to locate and maintain employment and sanitary housing, did not complete psychological evaluations or follow the psychologist's recommendations, did not maintain consistent contact with service providers, did not communicate honestly or forthrightly with DSS, did not cooperate with service providers, did not pay their debts or seek to establish credit, and did not pay child support as ordered by the court.

While the children were in foster care, K.S. was referred to Deborah Maxey,[6] a professional counselor, because she exhibited behavioral problems after visiting with her parents. She was also suffering from night tremors and nightmares, prolonged periods of crying, and separation anxiety when leaving her foster parents. Maxey saw K.S. once a week in play therapy and diagnosed K.S. with post-traumatic stress disorder in May 2003. Maxey described K.S. as being "anxiety-ridden." Maxey stated that K.S. "acted out all sorts of trauma about being left and abandoned, about not having enough to eat, about being in peril and no adult to come rescue her. So all of her themes were around traumatic play." For instance, K.S. often "jailed" Maxey in the closet during the play therapy sessions. K.S. told Maxey that she had seen her parents arrested for writing bad checks. K.S. also "gorged on food" during the therapy sessions because "she was scared of not having enough."

Maxey testified that K.S. made significant recovery while in foster care but that she regressed after each visit with her biological parents. She presented what she described as a "very strong opinion" about K.S.'s visitation with her parents:

> She should not see her biological parents because there is a clear
> regression . . . every time she'd have a visit and I asked twice that
> visits stop because I felt like what was happening—we were
> making a little bit of progress at home and in therapy and then she
> would have a visit and she would go backwards. All of the trauma

---

[6] Maxey is a certified Traumatologist and is trained in attachment disorders.

would start to replay itself in her dreams and her nightmares and her inability to focus and the crying jags—all of it would resurge.

Maxey also stated that she scheduled appointments with both parents, but that they failed to keep those appointments or to reschedule.

The parents moved from the Village Highway location in April 2003 and moved to a hotel. Repeating their earlier odyssey, they lived in five different hotels from April to June 2003 and ultimately moved to Hands Up Lodge, a homeless shelter.

DSS filed petitions to terminate parental rights on August 22, 2003. The juvenile and domestic relations district court terminated parental rights, and the circuit court heard the appeal in January 2004.

The parents represented themselves at the circuit court hearing. After DSS presented its case, the circuit court stated that it would not terminate parental rights based on the evidence presented. The parents thus presented no evidence. In its final order of February 10, 2004, the circuit court stated:

> The Court . . . finds that while the Court could terminate the residual parental rights and responsibilities of the [parents] in and to the children who are the subjects hereof it declines to do so on the basis that the [parents] are victims of their own poverty as more fully set forth in the record of these proceedings.

This appeal followed.

### III. Analysis

When addressing matters concerning the custody and care of a child, this Court's paramount consideration is the child's best interests. Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982).

When this Court reviews a trial court's decision regarding the termination of parental rights, we presume the trial court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Logan v. Fairfax

County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting

Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).  Because the trial court is

vested with "broad discretion in making the decisions necessary to guard and to foster a child's

best interests," Farley, 9 Va. App. at 325, 387 S.E.2d at 795, its decision will not be disturbed on

appeal unless it abused its discretion, id., or unless its decision was plainly wrong.  Peple v.

Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).  "An abuse of discretion can be found if

the trial court uses 'an improper legal standard in exercising its discretionary function,'"

Congdon v. Congdon, 40 Va. App. 255, 262, 578 S.E.2d 833, 836 (2003) (citation omitted),

because "a trial court 'by definition abuses its discretion when it makes an error of law.'"

Shooltz v. Shooltz, 27 Va. App. 264, 271, 498 S.E.2d 437, 441 (1998) (quoting Koon v. United

States, 518 U.S. 81, 100 (1996)).

> The law governing termination of parental rights is found
> in Code § l6.1-283(B) and (C).  Because both subsection (B) and
> (C) contain substantially the same requirements, a petition for
> termination may be based on either one or both.  See Ferguson v.
> Stafford County Dep't of Soc. Servs., 14 Va. App. 333, 340, 417
> S.E.2d 1, 5 (1992) (upholding termination under both subsections);
> see also Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573,
> 583, 546 S.E.2d 749, 754 (2001) (noting that both subsections
> "clearly relate to the same subject matter, have the same basic
> objectives, are framed under a single system, and, thus, are
> 'governed by one spirit and policy'") (quoting Stanley v. Tomlin,
> 143 Va. 187, 195, 129 S.E. 379, 382 (1925)).

Norfolk Div. Soc. Servs. v. Hardy, 42 Va. App. 546, 552-53, 593 S.E.2d 528, 531 (2004).  DSS's

petition to terminate parental rights in the instant case was based on both code sections.  See id.

Code § 16.1-283(B) provides, in pertinent part, that

> [t]he residual parental rights of a parent or parents of a child found
> by the court to be neglected or abused and placed in foster care . . .
> may be terminated if the court finds, based upon clear and
> convincing evidence, that it is in the best interests of the child and
> that:

1. The neglect or abuse suffered by such child presented a serious threat and substantial threat to his life, health or development*;* and

2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time.

Code § 16.1-283(C) provides, in relevant part, that:

[t]he residual parental rights of a parent . . . of a child placed in foster care . . . may be terminated if the court finds . . . that is in the best interests of the children and that:

\*   \*   \*   \*   \*   \*   \*

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement.

Both code sections also provide that proof "the parent has failed to follow through with the . . . reasonable rehabilitative efforts of social . . . agencies, which efforts are aimed at reducing or eliminating the abuse or neglect of the child in question," constitutes "*prima facie* evidence that the conditions leading to the foster care placement have not been remedied." Hardy, 42 Va. App. at 554, 593 S.E.2d at 532; Code § 16.1-283(B), (C).

At the completion of DSS's case, the trial judge stated,

The thing that bothers me more than anything else is my concern that maybe you are a victim of your own poverty . . . but I'm not going to terminate their parental rights today. I'm not going to do that. . . . [DSS has] proved [its] case. I can find that . . . [but] I'm not going to do it today.

Instead, the judge suggested deferring the termination of parental rights until adoption reports were filed in the juvenile and domestic relations district court or dismissing the case without prejudice. He asked what DSS "would prefer as far as the record goes." DSS responded that it wanted a final order so that it could appeal the trial court's decision. The judge responded,

"Now I'm going to deny [the termination petition] then and let you appeal it. . . . I'm just not prepared today—I have a nagging feeling that—you know—that your poverty is the source of ninety percent of what ails the children."  Consistent with its declarations during the proceedings, the circuit court repeated in its final order that it "could terminate the residual parental rights" of both parents but declined to do so because it found that the parents were the "victims of their own poverty."

The statutes governing termination of parental rights do not support the conclusion that severe poverty, per se, militates against termination.  Neither does any Virginia case law.  To the contrary, the Supreme Court of Virginia has declined to adopt such reasoning, as evidenced by its opinion in Richardson v. Henry County Dept. of Soc. Servs., 223 Va. 670, 292 S.E.2d 342 (1982).  In Richardson, mother's children were removed from her care, one child having been abused and the other two were found to be neglected.  Id. at 673, 292 S.E.2d at 344.  When DSS removed them, they were "dirty, were not properly clothed . . . , were hungry, and 'had no stable living situation at that time.'"  Id.  At the time of the hearing, the mother lived in a house devoid of running water and indoor plumbing.  Id. at 675, 292 S.E.2d at 345.  The trial court terminated parental rights, and the Supreme Court upheld that determination.  The Supreme Court stated that

> [t]he neglect of the children grew out of the mother's transient, nomadic, unstable conduct, combined with her unwise selection of male companionship.  The evidence shows that situation has not changed.  The record establishes the Department was diligent in offering the mother a wide range of planned rehabilitative services designed to aid her in improving the conditions that brought about the neglect.

Id. at 677, 292 S.E.2d at 346.  Thus, the Court held that termination was in the children's best interests.  Id.  The Court did not adopt, and no Virginia court has since adopted, the reasoning of the dissent, which stated that

> [t]he mother's relative poverty and fourth-grade education, contributing to her limited employment opportunities, go no

further to disqualify her as a parent than does her home's lack of running water. We have not reached a point where the State may take over the children of those who have the misfortune to be poor.

Id. at 679, 292 S.E.2d at 347 (Russell, J., dissenting).

When the statutory mandates have been met and when it is in the child's best interests, the Supreme Court's decision in Richardson signals that parental rights should be terminated, the parent's severe poverty notwithstanding. Such an outcome comports with what has been, and must always be, this Court's guiding principle when considering the termination of parental rights—the best interests of the child. See, e.g., Toombs, 223 Va. at 230, 288 S.E.2d at 407-08; Hardy, 42 Va. App. at 556, 593 S.E.2d at 533.

Thus, we find the circuit court incorrectly concluded that poverty, per se, militates against the termination of parental rights. See Congdon, 40 Va. App. at 262, 578 S.E.2d at 836.

Finally, we decline DSS's invitation to order that parental rights be terminated on appeal in light of the fact that the parents were not given the opportunity to present their case. On remand, the parents must be afforded the opportunity to do so. If they elect to do so, DSS must be afforded the opportunity to present rebuttal evidence. If the parents decline to present any evidence, leaving the record unchanged, the trial court is directed, in light of its finding and the evidence that supports it, to enter an order terminating parental rights.

We therefore reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.