# Richmond

## Julian B. Hepler v. Margaret R. Hepler.

January 25, 1954.

Record No. 4131.

Present, All the Justices.

The opinion states the case.

*R. B. Stephenson* and *William E. Carson*, for the appellant.

*Hale Collins* and *John T. Delaney*, for the appellee.

HUDGINS, C.J., delivered the opinion of the court.

On September 28, 1949, Margaret R. Hepler instituted a suit for divorce against her husband, Julian Hepler, and prayed for custody of their three children: Frank, who was nine; Robert, who was six; and William, who was two years of age. On November 3, 1949, before the case was heard on its merits, the parties executed a written contract whereby it was agreed that the mother should have the right to the custody of the three children except as follows: Frank and William should remain in the custody of their father until June, 1950, when they should be surrendered to the custody of their mother. After the year 1950 the father should have the custody of all three children during the school vacation period from June to September; the mother during the other nine months.

On December 17, 1949, the wife was granted a divorce *a mensa* on the grounds of desertion. The contract of the parties settling their property rights and the agreement as to the custody of the children was incorporated in the decree and approved by the court. Later the divorce *a mensa* was merged into a divorce *a vinculo*.

Immediately after the contract was executed, the mother, with the consent of the court, took Robert to live with her in Florida. Neither parent complied with the provisions of the agreement as to the custody of the children for nearly three years, *i.e.*, Frank and William remained in the custody of their father, and Robert remained with his mother in Florida. Each parent visited the children while they were in the custody of the other.

In August, 1952, Mrs. Hepler while visiting relatives near Covington, Virginia, notified the father that she desired to take the children to Florida with her when she returned. Mr. Hepler permitted the mother to see the children but declined to permit Frank or William to go with her.

On September 13, 1952, the father notified the mother that on September 22nd he would move the court to modify the decree of December 17, 1949, so as to give him custody of all three children. On the same date notice was served on the father that the mother would move the court to cite him for contempt for his failure to surrender the custody of Frank and William. On September 20th the two proceedings were heard together. The court found Julian Hepler guilty of contempt and refused to modify its decree as to the custody of the children. Julian Hepler, sometimes referred to as the father, obtained this appeal to review both of said orders.

The question presented imposes upon the court the delicate duty of determining the custody of infants, innocent offspring of a broken home. In performing this duty the governing principle by which the court must be guided is the best interest and welfare of the child. The good of the child is superior to the claim of either parent. It is the polar

star that the court always must keep in view in reaching its conclusion.

▮ The parents in this case are in modest circumstances. The father is buying a home near Covington where he has been living with his parents and two children since the separation. He earns $175.00 to $225.00 per month. The mother rents a house in Florida and earns $220.00 a month. Each seem to be fit and suitable persons to rear the children properly.

The controversy stems from the failure of the parents to comply with the provisions of the contract fixing custody and the resulting ties of love and affection that have developed since November 3, 1949.

The mother did not demand the custody of Frank and William in 1950 or in 1951 as she had a right to do under the terms of the agreement and the decree. In 1950, Robert, while in the custody of his mother, had a slight concussion of the brain. The father on being informed of this fact went to Florida to see him and saw that the proceeds of a Blue Cross insurance policy which he carried on Robert were applied to his medical and hospital bills.

The mother in 1951, without consulting the father, decided it was for the best interest of Robert to place him in a boy's camp. She notified the father of her plans and sent Robert to camp during the summer months, although under the decree, the father was entitled to Robert's custody during this time.

Mrs. Baxter Hepler, the father's mother, lives with her son and keeps house for him. This grandmother shares with her son the care and training of Frank and William. The children are taught to be courteous and obedient. They attend church and Sunday school regularly and are kept neat and clean. Frank has been a regular attendant at the local public school. His school record for the year ending 1952 shows that he made "A" grades in all his studies except art and music in which his grades were "B's."

While on a visit to Virginia in the summer of 1951, the mother saw Frank and William several times. Occasionally

she took them on visits to her relatives. At that time the father and grandmother, as well as Frank, expected the mother to take the children with her when she returned to her home in Florida, but she did not take them. Frank, at that time (August, 1951) wanted to go with his mother. His grandmother said he was "badly disappointed" when she failed to take him.

In August, 1952, the mother wrote Frank an affectionate birthday letter telling him, "to get his things ready to come to Florida" as she was coming for him in a few days and would take him to live with her in Florida. In the same envelope she enclosed a letter to the grandmother telling her she had rented, "a cute place" for herself and the three boys. She also stated that it was a "hard letter to write," that she did not want the children to be disturbed any more than was necessary, and that it would be best to pack the children's clothes, and put the children in the car without telling them that they were starting for Florida, and thus eliminate sad "good-byes." She expressed her appreciation for what the grandmother had done for her and for the children. These letters, indicating the mother's intention to take the boys to Florida, disturbed Frank very much.

The mother came to Virginia in August, 1952, and on one occasion, with the consent of the father, took the children to a fair in Lewisburg, West Virginia. That night, while sleeping with his father, Frank began to cry and said, "Mother is going to take me back to Florida." The father testified, "And I got him up in my arms and kind of consoled him a little and told him I was going to try to keep him here if there was any way possible, if he didn't want to go. And he cried himself to sleep that night." Later Frank became so disturbed and emotionally upset that it became necessary for him to have medical treatment to quiet his nerves. The father, observing the effect of the proposed change of custody on Frank, determined to apply to the court for a modification of its decree fixing the custody of the children, all three of whom were then with him. On being told that his attorney, R. B. Stephen-

son, was leaving on vacation beginning August 16th, he immediately employed Mr. William A. Carson for the specific purpose of making application to the court for a modification of the decree of December 17, 1949. On August 20th or 22nd the mother, for the first time since November 3, 1949, asked the father for the immediate custody of Frank and William, stating that she desired to take them with her to Florida. The father knowing that under the terms of the decretal order he was entitled to the custody of all three children until September, 1952, declined to surrender them to the mother. But when Robert said that he wanted to go with his mother, the father raised no objection. The mother took Robert with her and left Virginia on or about August 22, 1952 for Florida.

In the meantime the attorney for the father had prepared a motion praying for a change in the custody of the children, but at that time he was unable to obtain service on the mother since she had left Virginia.

The act of the father refusing the mother's request for the children in August was not a violation of the decretal order, since under the order, he was entitled to the custody of all three children from June to September. The father knew that if he complied with the mother's request, she would remove the children to Florida, and thus the children would be beyond the jurisdiction of the Virginia courts. Notice of the motion for change in custody of the children, previously prepared by the father's attorney, was served upon the mother on September 13, 1952, soon after she returned to Virginia.

The mother and her attorney knew that the father's refusal to surrender the custody of the children in August was not a violation of the decretal order. Therefore on September 13th they had the deputy sheriff, in the name of the mother, demand custody of Frank and William. Immediately after the father's refusal to comply with this request, the deputy sheriff served notice on him that the court would be asked to issue a rule against him for contempt.

The two proceedings, one seeking a change in custody of the children, and the other seeking a rule against the father to show cause, were instituted simultaneously and were heard together.

The court, upon this uncontradicted testimony adjudged the father guilty of contempt and in its opinion said: "I am further of the opinion that Mr. Hepler is in contempt of this court in openly taking the position that he was not going to comply with the decree of the court, and filing a petition for change in custody came too late. I am, therefore, going to find him guilty of contempt and fix his punishment at a term of 20 days in jail, that sentence to be suspended, however, if he forthwith complies with the order of this court now and turns those children over to Mrs. Hepler. If he fails to do so, he will have to serve 20 days."

\* \* \* \* \* \* \*

Mr. Stephenson (attorney for the father): "You said if he did not comply that you would suspend his sentence."

The Court: "If he does comply, it suspends his sentence. If he does not, I will not. I want to say this: I mean comply forthwith. If he does not comply forthwith, he has to serve that sentence. If he takes an appeal and this court is reversed, of course, he does not have to serve it. But if he takes an appeal and this court is affirmed, then he has not immediately complied and he will have to serve his sentence. I just wanted to say that to you."

Code Section 20-108 gives either parent the right to seek a revision or alteration of a decree, "concerning the care, custody, and maintenance of the children" and "to request the court to make a new decree concerning the same, as the circumstances of the parents and the benefit of the children may require."

The father simply exercised the right, given him by the statute, to apply for change in the custody of the children. He not only obtained advice of counsel but actually paid counsel in August for his services. There was no undue delay

in making application for revision of the decree, either on the part of the father who while he had a legal right to the custody of the children employed counsel, nor was counsel dilatory in his attempt to get service upon the mother which was obtained within a reasonable time after she returned to Virginia. The only act that possibly could be construed as a violation of the decree was the refusal of the father to surrender Frank and William to the deputy sheriff on September 13th. On that day service asking for a change in custody was made upon the mother. No act of the father tended to bring the authority of the court and administration of justice into disrepute. There was no willful disregard of, or disobedience to the order. Indeed the father was seeking the adjudication of the court to determine the best interests of the children in view of the then existing circumstances. If he had complied with the request the mother made in August, or with the request of the deputy sheriff, probably the mother would have removed the children to Florida, thereby making it difficult if not impossible, to enforce the change in custody of the children, if such change had been authorized by the court.

The evidence is insufficient to sustain the judgment of the court finding the father guilty of·contempt.

The next question presented is whether the trial court erred in its refusal to modify its decree as to the custody of the children.

During the taking of testimony Frank was offered as a witness by the father. The court refused to accept him as a witness, to swear him, or to consider his testimony in determining to whom his custody should be awarded. The precise ruling of the court appears in the record from the following colloquy between court and counsel:

"Mr. Stephenson: We want to put on the stand, or ask the Court to put on the stand, either one, Frank Hepler.

"The Court: I do not think that is going to make any difference. I would rather you did not put him on.

*       *       *       *       *       *       *

"The Court: I do not think you ought to do it, sir, because regardless of what he thinks or anything it will have nothing to do with it. I realize how children are about these things.

\* \* \* \* \* \* \*

"Mr. Stephenson: I realize that is true of a small child, but at his age—

"The Court: No, I do not think so. You may offer it. Go ahead.

\* \* \* \* \* \* \*

"The Court: There is no use to swear him.

\* \* \* \* \* \* \*

"Mr. Stephenson: I would not offer the boy except that I think his age is sufficiently clear.

"The Court: I am sure he is a very intelligent child and all that.

"Mr. Stephenson: Do you think he ought to be sworn then?

"The Court: No, I do not."\*

This ruling of the court clearly was erroneous. This boy was twelve years of age. He was unusually bright and intelligent as shown from his unsworn statements in the record and from his scholastic record. The competency of a child as a witness to a great extent rests in the sound discretion of the trial judge whose decision will not be disturbed unless the error is manifest. It is the duty of the trial judge to determine such competency after a careful examination of the child. In deciding the question the judge must consider the child's age, his intelligence or lack of intelligence, and his sense of moral and legal responsibility. The principles to be applied in determining the competency of a child as witness were restated at some length in *Cross* v. *Commonwealth*, 195 Va. 62, 77 S. E. (2d) 447. The court without examining Frank on his *voir dire* acknowledged that he was "a very in-

---

\*The court permitted the unsworn statement of the boy to be included in the record merely for consideration on appeal.

telligent child" and still refused to accept him as a witness or consider his testimony concerning his own happiness and welfare.

The general rule is that a litigant is entitled to introduce all competent, material and relevant evidence which tends to prove or disprove any material issue raised. Moreover it is the duty of the court to give due consideration to such evidence before his findings of fact are made. *Bole* v. *Bole*, 76 Cal. App. (2d) 344, 172 P. (2d) 936, and other cases annotated in 2 A. L. R. (2d) 1330. In Virginia a child is not an incompetent witness merely because his parents are parties to a suit for divorce in the case in which he is called to testify.

The propriety of calling a child of tender years to testify on the grounds of divorce in a controversy between their parents is questioned by some authorities. But even these authorities hold that, in the absence of statute, the testimony of such children, if they are otherwise competent, is legally admissible, though to permit them to testify may be undesirable from a social viewpoint. *Buck* v. *Buck*, 320 Mich. 624, 31 N. W. (2d) 829; 2 A. L. R. (2d) 1325 and Annotations p. 1329; 17 Am. Jur., Divorce and Separation, Sec. 395, p. 343.

The facts in the case under consideration do not bring it within the influence of the above authorities. Frank was offered as a witness to testify concerning his own happiness and welfare and not on whether his mother or his father was entitled to a divorce.

As heretofore stated the general rule is that in determining the custody of a child, the paramount consideration of the court is the welfare and best interest of the child. Where such child has reached the age of discretion, his wishes should be considered and given weight, though they are not conclusive. *Vilas* v. *Vilas*, 184 Ark. 352, 42 S. W. (2d) 379; *Davis* v. *Davis*, 255 Ala. 592, 52 So. (2d) 387; *Harmon* v. *Harmon*, 264 Ky. 315, 94 S. W. (2d) 670; *Buehler* v. *Buehler*, 373 Ill. 626, 27 N. E. (2d) 466; *Garlin* v. *Garlin*, 154 Okl. 230, 7 P. (2d) 463; *Wilson* v. *Mitchell*, 48 Col. 454, 111 P. 21;

*Johnston* v. *Johnston*, 155 Ore. 256, 63 P. (2d) 209; *Umlauf* v. *Umlauf*, 128 Ill. 378, 21 N. E. 600.

In *Nelson* v. *Nelson*, 260 P. (2d) 886, 887, it is said, "The rule is that when children have reached an age of discretion, their wishes on the issue of custody may be considered but are not controlling * * * And as to what is an age of discretion in this regard (note the qualifying words), the authorities hold that the test is whether the child is sufficiently mature to have intelligent views and wishes on the subject."

The attorney for the mother cites and relies upon several Virginia cases to sustain the ruling of the court in its refusal to accept Frank as a competent witness. Most of these cases were reviewed in *Williams* v. *Williams*, 192 Va. 787, 66 S. E. (2d) 500. The facts in the *Williams* case and in the others cited are distinguishable from the facts in the case now under consideration. In the *Williams* case the controversy was over the custody of a five year old boy, between the grandparents and the parents who had never surrendered the legal custody of their son. In the course of the opinion in that case this is said, "Junior was in the courtroom with the grandparents. If he had been permitted to testify and had testified that he wished to remain with his grandparents, the result would have been the same. The wish of an infant is entitled to be considered, but it is not conclusive, especially in a case of a child of such tender years as the age of five." There is a marked difference in the degree of discretion and intelligence in a normal child of five years old and one twelve years of age, hence the principle stated in the *Williams* case is not pertinent to the facts in this case.

This brings us to the vital question whether the evidence, including the unsworn statement of Frank, was sufficient to show such a change of conditions and circumstances that the welfare of the children required a modification of the decree awarding their custody.

"No inflexible rule can be laid down by which fitness may be determined. Each case must be decided on the particular facts. The character and habits of the person seeking cus-

tody must be shown to be such that provision for the child's comfort and moral development can be reasonably expected at his hands." *Williams* v. *Williams,* 192 Va. 787, p. 793, 66 S. E. (2d) 500, p. 503.

For nearly three years the mother, without objection, permitted Frank and her two year old son, William, to remain in the custody of their father. On the other hand the father, without objection, permitted Robert, his six year old son, to remain with his mother. During this period Frank and William had become accustomed to their home with their father. Strong ties of love and affection had developed between them and their father and grandmother. They had been well trained. They were well behaved, obedient and courteous to their elders. Their education had not been neglected. They had been required to attend Sunday school and church. Frank had become so devoted to his father and grandmother that the very thought of leaving his father's home and going to a new home in Florida, so disturbed and agitated him that it was necessary to call the family doctor to see him. This doctor said that he found Frank to be so "nervous," "jerky," "crying and incoherent," that it was necessary to give him a sedative to quiet his nerves.

"The children's happiness, their psychological adjustment, their own wishes, are as much entitled to consideration as changes in material environment." *Cook* v. *Cook,* 135 F. (2d) 945.

The father has changed his working hours, at less pay, in order to spend more time with his children and in their training. When he is at work the children are under the care and supervision of their grandmother. Frank and William, even before the separation of their parents, spent a greater part of their lives with their grandmother. She has an excellent reputation among her friends and neighbors. She maintains a quiet, peaceful, Christian home for her son and his children, to whom she is devoted.

The mother rents a home in Florida. She works from 8:00 A. M.-4:00 P. M., so she cannot be with the children

during working hours. She plans to employ an inexperienced eighteen year old girl to look after the children during this time. The atmosphere of such a home cannot be as beneficial to children as the atmosphere of the home of the father where the grandmother has the care of the children while the father is at work.

Where it is reasonably possible, brothers and sisters of tender years should be reared together, and have the full benefit of natural ties of affection and interest that such association develops. To separate Frank and William, who have lived together in the home of their father and grandmother for so long, would deprive each of them of this association.

The determination of the question of custody will result in heartaches. Even so, experience has shown that Frank's and William's comfort and moral development will be assured if they are permitted to remain with their father and grandmother. It is not so certain that the same results would be achieved if their custody was transferred to their mother under present conditions.

Robert has been in the custody of his mother, except for short visits to his father, since the separation. The uncontradicted testimony is that this boy, now eleven years of age, prefers to remain in the custody of his mother. On the boy's expressed wishes his father, without objection, permitted the mother to take him to Florida where he now is.

Several neighbors testified that the father seemed to love his children and was "just as good to them as a father could be" and that the children love him—"When they are out together, they have hold of his hand, or right up against him all of the time. It seems like they think a lot of him."

The uncontradicted testimony is that during the summer of 1952, while Robert was with his father, a decided difference in the attitude and behavior of Robert and Frank was noticeable. Frank was polite, courteous and obedient. Robert was impudent, headstrong and disobedient. His attitude and behavior improved·after he had been in the custody of his

father and grandmother for several weeks. Robert's unusual behavior may have been due to the fact that he was not as strong and vigorous as Frank or that he hadn't had the benefit of association with his brothers or other small children. Whatever the cause, such evidence must be given some consideration in deciding custody of the children.

We conclude from a careful consideration of the entire record that the welfare and best interest of Frank and William require that their custody be awarded to the father, with the right of the mother to see and visit them at reasonably convenient times and places; and that the custody of Robert be awarded to the mother with the right of the father to see and visit him at reasonably convenient times and places. The period of the awards, with the consent of both parties, may be modified to permit the three children to spend a part of their time together.

The attorneys for the mother, in their brief, pray that this court compel the father to pay the cost of this appeal and a reasonable attorney fee for their services rendered the mother in this court.

The parties, by agreement which was approved by the trial court, not only agreed on the settlement of their property rights but agreed that the father should pay $60.00 per month for the support of the three children, only when all three of the children were in the custody of the mother, and that no part of the $60.00 should be paid to the mother for the children's support while any one of them remained in the custody of the father. The trial court, in the decree to which this appeal was taken, modified this part of the agreement as follows: "Pending application for the appeal and during the appeal if the same be allowed, the said defendant shall pay to the complainant for the support and maintenance of Robert Hepler, now in the possession of the complainant, the sum of $20.00 per month, beginning October 1, 1952."

It is stated in the reply brief that the father has paid $20.00 a month for each and every month since October 1, 1952, or a total of $240.00 as of October 1, 1953. If the father has con-

tinued to make these payments since that date, the payments would now total $300.00.

We find no new or additional evidence which would justify the court in modifying the agreement of the parties as to the payment by the father for the support and maintenance of the children when they are not in his custody.

Considering the earning capacity of each of the parties heretofore stated, their mode of life and agreement as to the payment for the support and maintenance of the children, we think the trial court erred in requiring the father to pay $20.00 per month for the support and maintenance of Robert, while in the custody of the mother. The father should not be required to make additional payments under the decree of the trial court.

Under these circumstances and conditions the mother should pay her own attorneys and no fee will be allowed them for the services rendered her in this court.

We further hold that the father is entitled to recover the cost of the appeal from the judgment of contempt. Ordinarily a wife would be entitled to recover of a husband the cost of an appeal from a decree modifying or refusing to modify the award of the custody of children. But the two proceedings in this case were heard together and constitute one record, therefore we direct that the total cost of this appeal be divided equally between the parties.

The order finding Julian B. Hepler guilty of contempt is hereby reversed and the rule against him to show cause is dismissed.

The decree refusing to modify the decree of December 17th, 1949, concerning the custody of the three children is reversed and the case remanded with directions to the trial court to enter a proper decree awarding the custody of the children as herein specified.

*Reversed.*

*Final decree as to the
contempt proceedings.*

*Remanded with directions.*