COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Kelsey and Beales
Argued at Richmond, Virginia


JOSEPH ARTHUR LUIS KLEVENZ

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
v.     Record No. 2481-11-2                         FEBRUARY 5, 2013

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Frederick G. Rockwell, III, Judge

Steven D. Benjamin (Betty Layne DesPortes; Benjamin &
DesPortes, P.C., on briefs), for appellant.

Donald E. Jeffrey, III, Senior Assistant Attorney General
(Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.


Joseph Arthur Luis Klevenz was convicted by a jury in the Circuit Court of the County of

Chesterfield of forcible sodomy in violation of Code § 18.2-67.1 and was sentenced to five years

of imprisonment. Appellant argues on appeal that the trial court erred in (1) "denying the

defense motion for access to the residence where the [crime] allegedly occurred for the purpose

of photographing and videotaping" the crime scene, (2) finding that the victim[1] was competent to

testify, (3) "failing to administer the oath to the four-year-old child [victim] prior to her

testimony before the jury and in giving the jury the false impression that the oath had been

administered," and (4) "denying the motion to strike at the conclusion of the evidence because

the evidence was insufficient to support a conviction for sodomy where the Commonwealth

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We use "the victim" in place of the victim's name in an effort to protect her identity and
privacy.

failed to prove appellant inserted his penis into the child's mouth." For the following reasons, we conclude that the trial court did not err with regard to assignments of error two and four and that assignments of error one and three are waived on appeal because they were not preserved in the trial court. Therefore, we affirm appellant's conviction.

## I. BACKGROUND

On appeal, we consider "the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party" in the trial court. Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004). So viewed, the offense occurred at the three-year-old victim's grandparents' home, in the basement playroom of their house, on Christmas Day 2010. Appellant, who was one of a number of relatives (approximately 25 or 30 people in total) at the home on that day, is the victim's mother's cousin.

### Access to the Residence

The parties litigated appellant's motion asking the trial court to enter an order directing the victim's grandparents to allow defense counsel access to their home for the purpose of photographing and videotaping. The written motion stated the defendant needed to take "photos and video" and "videos and or pictures" of the residence to rebut the victim's father's assertion "that a corner of the room might not be visible from someone walking by the open door." Defense counsel argued that "[t]his is disputed by the defense and pictures and video will reveal the truth to the jurors." The trial judge denied the motion. Photographs were admitted, however, at trial from the Commonwealth and the defense, and these photographs are discussed *infra*.

### Competency of the Victim Witness

During an *in camera* proceeding with the prosecutor and defense counsel present, the trial judge asked the victim questions to determine her competency to testify at trial. The evaluation took approximately five minutes. The trial judge asked the victim: "Is it a bad or a good thing to

tell a lie?" The victim responded, "Bad." When the trial judge asked her what happens when one lies, the victim responded, "You get in trouble." The judge then asked her, "What happens when you get in trouble?" She responded, "I can't have any dessert." The judge asked the victim: "Now, if I asked you to tell me the truth. And I said raise your right hand, and you promise you'll tell the truth, can you do that?" The victim responded affirmatively by nodding her head. The judge followed up by asking, "What happens if you don't [tell me the truth]?" When she indicated she was uncertain, he asked, "Bad or good?" The victim responded, "Um, maybe bad."

Counsel and the trial judge then returned to the courtroom, and the judge stated:

> I asked [the victim] the questions hopefully to ga[u]ge her ability to understand taking an oath and telling the truth.

> *    *    *    *    *    *    *

> After those questions I have no problem with her competency in that regard. I think I find her pretty competent based on her answers and responses. Unless you have some other comment?

Defense counsel responded, "No, Your Honor."

### Administration of the Oath to the Victim Witness

Just before the victim took the witness stand at trial on September 1, 2011, the trial judge asked, "We are not going to swear [the victim]?" The Commonwealth's attorney responded, "No, Judge. We already resolved that." Defense counsel remained silent.

### The Incident

The victim, her parents (T.B. and M.B.),[2] and her brother visited the victim's grandparents' home for the family Christmas celebration on December 25, 2010. The victim was

---

[2] We use the victim's parents' initials instead of their names in an effort to better protect their privacy.

playing with appellant during the day. M.B. (the victim's mother) testified that later in the day, the victim climbed into her lap and that her tights "were pulled down to her knees, the crouch [sic] part, and her underwear was pulled down in the back." She testified that her daughter "is a chunky little thing, so [the tights] definitely fit," and the tights "didn't fall down before or after" this time. T.B. (the victim's father) also testified that the victim told him and his wife "that she [was] ready to go home, [and] want[ed] to go home." T.B. observed that she was acting "very mopy and clingy," which was not typical behavior for her.

The victim and her family left the grandparents' house between 6:30 p.m. and 7:00 p.m. on Christmas Day. Once they returned to their home, the victim played with her other grandmother and prepared for bed. T.B. testified that, after the victim's grandmother read her a story, he entered the room and asked his daughter to stand up and give him a hug. The victim stood up and started crying. T.B. asked her what was wrong and she responded, "Joe put his weenie in my mouth." He "asked her what she [was] talking about," and "she [told him] the same thing over again, that Joe put his weenie in [her] mouth." He "asked her if she was confused . . . and she said no he put his weenie in my mouth." T.B. testified that he then inquired why she did not tell her parents sooner, to which the victim responded "Joe told [her] it was a secret between the two of [them]" and that "he told her that if she said anything that she would be in big trouble." T.B. then called his wife into the room, and the victim repeated the statement to her. T.B. testified that when M.B. left the room to call her parents' house, the victim stated, "at first [she and appellant] were having fun in the playroom. And then he put his weenie in her mouth." T.B. asked the victim "how she knew it was a weenie, and she told [him] it was soft and squishy with a hole in the end of it." He asked if appellant had taken his pants down, and the victim said, "[N]o, he had pulled it out of his pants." T.B. stated he "knew [the victim] was talking about a penis" when she used the term "weenie." The following day, the

- 4 -

victim's parents and her paternal grandmother spoke with her again, and M.B. testified that "she repeated that Joe put his weenie in [her] mouth."

The victim testified at trial that when she was playing with appellant, he "put his weenie in my mouth" while she was sitting down on a bean bag chair with a blanket. This testimony was consistent with information she provided during a forensic interview with Chesterfield County Police Detective Laura Kay. The victim testified that she did not see appellant's "weenie . . . because [she] closed [her] eyes . . . because he told [her] to." Counsel asked the victim "How do you know what he put in your mouth?" and she responded "Because I just did . . . Because it was so squishy I know what it was." She explained that it came from his pants, and noted that no one else was in the room, that it was "Just me and Joe." The victim testified at trial and also stated during the forensic interview that appellant told her this conduct was a secret.

During her interview with Detective Kay, the victim correctly identified the mouth on a drawing and pointed to the genital area of a male drawing to demonstrate where appellant's "weenie" was. When asked to demonstrate with anatomically correct dolls (depicting male and female genitalia) what appellant had done, the victim pulled the male doll's pants down enough to expose the penis and shoved the penis into the female doll's mouth. She also said appellant's penis was "pointing up" when he removed it from his pants. The victim told Detective Kay that appellant told her to close her eyes during the incident on the blanket.

When Detective Kay asked the victim to demonstrate on a drawing depicting a female where her "girlfriend" (which the record reveals is the term the victim's parents taught her to use when referring to her vagina) was located, the victim pointed to the vaginal area. The victim testified that her "girlfriend" is in the middle of her legs. She said appellant's "weenie" is in the middle of his legs.

During an interview with Detective Kay, appellant denied placing his penis in the victim's mouth. He described sexual and physical abuse that he experienced from his family members which occurred before his father, Michael Klevenz, adopted him. Appellant offered various versions of the incident to Detective Kay. First, he told Detective Kay that the victim had gotten dust in her mouth from the ceiling fan while they were playing near it, causing him to insert his thumb into her mouth to clear it. Second, he explained that he and the victim were playing with a stuffed dragon that was "squishy" with a "hole in it" and the victim bit the toy dragon at some point. Third, appellant explained that he had allowed the victim to play with his tongue ring.

Appellant admitted to Detective Kay that he had told the victim not to tell anyone about his behavior. However, he claimed this statement was related to his allowing the victim to touch his tongue ring. He elaborated that his father did not like his tongue ring. He denied telling the victim she would be in trouble if she were to tell. He claimed that he told her *he* would be in trouble if anyone found out about the tongue ring incident, which he called his secret. At trial, appellant denied any improper sexual activity with the victim.

The trial court denied appellant's motion to strike. In that motion, appellant maintained the Commonwealth had failed to prove he had penetrated the victim's mouth with his penis. The trial judge also denied appellant's renewed motion to strike.

## II. ANALYSIS

### Access to the Residence

In his first assignment of error, appellant argues that the trial court erred in denying the defense motion for access to the residence where the crime occurred for the purpose of photographing and videotaping. Appellant contends that the information to be gained through access to the residence was central to his defense because the question whether the conduct could

have occurred in the open playroom without detection by the numerous people walking by and in the adjacent den area was a crucial factual determination to be made by the jury. Thus, he asserts that taking pictures and videotape of the scene was necessary to convey to the jurors what the view into the playroom was – and to show the playroom's close proximity to family members.

At trial, appellant focused his argument on this issue on his contention that the trial judge had the *authority* to grant third party access to the residence for the purpose of photographing and videotaping the crime scene. The trial judge did not think he had this authority and denied appellant's motion. But see, Henshaw v. Commonwealth, 19 Va. App. 338, 346, 348, 451 S.E.2d 415, 419-21 (1994). However, the trial judge admitted into evidence photographs and a diagram of the residence, which had been produced by the police department. See id. at 346-48, 451 S.E.2d at 419-21 (explaining that due process affords criminal defendants "a right to view [and] photograph . . . the crime scene" if the defendant "makes a showing that a substantial basis exists for claiming that the proposed inspection . . . will enable the defendant to obtain evidence relevant and material to his defense"; noting that there is an exception to this right when "due to special circumstances the private citizen's constitutional right to privacy outweighs the accused's right to view" the premises; and holding, under the circumstances of that case, that the defendant "was fully able to present his evidence through the Commonwealth's photographs that were made available [and] the diagram of the room," thereby affirming the defendant's conviction even though the trial judge erred in denying defendant access to the crime scene).

Here, when the topic of photographing and videotaping the residence came up, the trial judge inquired, "Can't we agree to have pictures taken of the interior?" The Commonwealth stated, "[Defense counsel] never asked me to facilitate or to figure that out. The police department has already done that. We have a sketch. We have 58 photographs." The trial judge ultimately admitted into evidence a three-page diagram of the house and a total of 33

photographs – 12 of which depict the house, 20 of which are casual photographs of family members at the house on the day of the incident, and one of which shows the toy dragon that appellant claims was the object that entered the victim's mouth.

The diagram shows the layout of the house, including the playroom where the incident occurred, and its relation to the rest of the house where the family was spending Christmas Day. The 12 photographs of the house include photographs of the house itself, the entrance to the playroom where the incident occurred, the adjacent den, and the interior of the playroom. The photographs of the entrance to the playroom are taken from more than one angle, and they suggest that it would be difficult for a passerby to see into all of the room.

Appellant contends for the first time on *appeal* that the documentation introduced by the Commonwealth (the photographs and diagram) was not to scale, lacked panoramic views, and inaccurately conveyed the lighting and other conditions in the room. Appellant never made these arguments at trial. Appellant never contended at trial that the photographs and diagram in evidence were insufficient and, thus, that additional photographs and video would be necessary for him to develop his defense.[3] Appellant simply failed to make any argument at all at trial that the Commonwealth's photographs and diagram would be insufficient for the preparation of his defense.[4] Accordingly, this argument has been waived on appeal under Rule 5A:18, which states in pertinent part:

---

[3] In addition, appellant's father, Michael Klevenz, testified at trial that he and appellant's trial counsel went to the grandparents' residence after the incident occurred.

[4] Because not all of the 58 photographs offered by the Commonwealth were even admitted into evidence, we cannot tell whether any of those unadmitted photographs would have sufficed for defense purposes. Thus, in addition to the fact that this argument is waived under Rule 5A:18, the record is inadequate to decide this assignment of error. See Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1185, 409 S.E.2d 16, 20 (1991) (holding that "[t]he burden is upon the appellant to provide us with a record which substantiates the claim of error. In the absence thereof, we will not consider the point.").

> No ruling of the trial court or the Virginia Workers' Compensation Commission will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice.

Furthermore, appellant has not asked this Court to invoke the good cause or ends of justice exceptions to Rule 5A:18, and this Court does not invoke those exceptions *sua sponte*. Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).

Therefore, on this record, we cannot conclude as a matter of law that the trial court's denial of appellant's motion for access to the residence constituted reversible error.

### Competency of the Victim to Testify

In his second assignment of error, appellant argues that the trial court erred in finding that the victim, who was four years old at the time of trial, was competent to testify. A trial court's determination on the competency of a witness is reviewed under an abuse of discretion standard. Ortiz v. Commonwealth, 276 Va. 705, 712, 667 S.E.2d 751, 756 (2008). Evidence from the trial judge's evaluation of the victim supports his finding that she was competent to testify. Accordingly, we find that the trial judge did not abuse his discretion in making this finding.

A child witness is competent to testify "if he or she possesses the capacity to observe, recollect, communicate events, and intelligently frame answers to the questions asked of him or her with a consciousness of a duty to speak the truth." Greenway v. Commonwealth, 254 Va. 147, 153, 487 S.E.2d 224, 227 (1997) (citing Cross v. Commonwealth, 195 Va. 62, 64, 77 S.E.2d 447, 449 (1953)). "It is the duty of the trial judge to determine such competency after a careful examination of the child." Helper v. Helper, 195 Va. 611, 619, 79 S.E.2d 652, 657 (1954); see also Virginia Rules of Evidence, Rule 2:601(b) ("A court may declare a person incompetent to testify if the court finds that the person does not have sufficient physical or mental capacity to testify truthfully, accurately, or understandably."). "There is no fixed age at which a child must

have arrived in order to be competent as a witness." <u>Davis v. Commonwealth</u>, 161 Va. 1037, 1039, 171 S.E. 598, 598 (1933) (citing <u>Rogers v. Commonwealth</u>, 132 Va. 771, 773, 111 S.E. 231, 231 (1922)).

Here, the trial judge asked the victim numerous questions to effectively evaluate her competency during a five-minute evaluation *in camera* in which attorneys for both parties were present. The trial judge's evaluation of the victim reads in pertinent part:

> Q: Is it bad or a good thing to tell a lie?
>
> A: Bad.
>
> Q: What happens?
>
> A: You get in trouble.
>
> Q: What happens when you get in trouble?
>
> A: I can't have any dessert.
>
>          \*      \*      \*      \*      \*      \*      \*
>
> Q: If you were to tell your mommy and daddy a lie, what would happen?
>
> A: They would – my daddy – or my mommy doesn't have treats if they didn't lie.
>
> Q: Do you know what a promise is? When you make a promise, what are you doing? Do you know?
>
> A: (Shakes her head side to side.) Mm-mm . . .
>
>          \*      \*      \*      \*      \*      \*      \*
>
> Q: Now, if I asked you to tell me the truth. And I said raise your right hand, and you promise you'll tell the truth, can you do that?
>
> A: (Nods her head up and down.)
>
> Q: What happens if you don't?
>
> A: (Shrugging her shoulders up and down.) Mm-mm . . .

Q: Bad or good?

A: Um, maybe bad.

The victim also accurately recalled a past traumatic event. She remembered her family had a dog, but had to get rid of it because it had bitten one of her parents.

It is clear from the trial judge's evaluation of the victim that she was intelligent and reasonably articulate, had the ability to recall past traumatic events (as is pertinent here), and appreciated the concept of telling the truth and the adverse consequences of lying. See Durant v. Commonwealth, 7 Va. App. 454, 466-67, 375 S.E.2d 396, 402 (1988) (holding that the child need not understand the meaning of the "oath," but must recognize that she has a duty to tell the truth). Therefore, we find that the trial judge did not abuse his discretion in finding that the victim was competent to testify.

### The Oath

In his third assignment of error, appellant argues that the trial court erred in failing to administer the oath to the four-year-old child accuser prior to her testimony before the jury and in giving the jury the false impression that the oath had been administered. This argument has been waived on appeal under Rule 5A:18 because defense counsel had an opportunity and an obligation to object at trial to the victim not being sworn, but defense counsel did not do so.

Just before the victim took the witness stand at trial, the trial judge asked, "We are not going to swear [the victim]?" The Commonwealth's attorney responded, "No, Judge. We already resolved that." At this point, defense counsel remained silent and did not raise any objection or argument.

Because defense counsel did not object to the trial judge's failure to administer the oath, this argument is waived on appeal under Rule 5A:18. Appellant unpersuasively argues that the "ends of justice" exception to Rule 5A:18 applies here. However, we find that that this argument

amounts merely to a contention that a miscarriage of justice "might have occurred" because he essentially asks this Court to speculate that the four-year-old victim's testimony would have been different if the trial court had not failed to administer the oath to her.  See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)).

<u>Sufficiency of the Evidence</u>

In his fourth assignment of error, appellant argues that the trial court erred in denying the motion to strike at the conclusion of the evidence because the evidence was insufficient to support a conviction for forcible sodomy where the Commonwealth failed to prove the defendant inserted his penis into the child's mouth.

When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"  Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner, 268 Va. at 330, 601 S.E.2d at 574, "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)).  See also Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008).  "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.

Appellant was charged with violating Code § 18.2-67.1, which reads in pertinent part:

> An accused shall be guilty of forcible sodomy if he or she engages in cunnilingus, fellatio, anilingus, or anal intercourse with a complaining witness whether or not his or her spouse, or causes a complaining witness, whether or not his or her spouse, to engage in such acts with any other person, and . . . [t]he complaining witness is less than 13 years of age.

To prove fellatio, the Commonwealth had to prove that appellant put his penis in the victim's mouth.[5] There is ample evidence supporting the trial court's conclusion that appellant put his penis in the victim's mouth, and, thus, is guilty of forcible sodomy.

Specifically, the victim testified at trial that appellant put his "weenie in [her] mouth." She elaborated in her testimony that appellant's "weenie" is in the middle of his legs. During her videotaped forensic interview with Detective Kay (which was admitted into evidence without limitation), she did not hesitate to demonstrate with anatomically correct dolls exactly how appellant inserted his penis in her mouth. She pulled the male doll's pants down enough to expose the penis and shoved the penis into the female doll's mouth. The victim also identified various parts of the male and female body, including the relevant groin area and the mouth. The victim also pointed to the groin area on a drawing when asked where appellant's "weenie" was located. The victim testified at trial that her "girlfriend" is in the middle of her legs. The record establishes that the victim referred to her vagina as her "girlfriend" because her parents had told her to use that term prior to the offense. Although the location of the vagina is not at issue in this appeal, the victim's ability to identify it – along with the other relevant body parts – goes to her credibility as a witness.

The jury was entitled to find that the object placed in the victim's mouth (which she testified "was soft and squishy with a hole in the end of it") was a penis. Viewing the evidence

---

[5] Since Code § 18.2-67.1 does not define "fellatio," the term is given its ordinary meaning. See Horton v. Commonwealth, 255 Va. 606, 612, 499 S.E.2d 258, 261 (1998).

in the light most favorable to the Commonwealth, as we must since it was the prevailing party below, such a finding is particularly reasonable because the victim told Detective Kay she observed the "weenie" as it was "pointing up," which is consistent with an erection, and the victim's father testified that he asked her "if [appellant] had taken his pants down, and she said no, he had pulled it out of his pants." The victim testified that she closed her eyes because appellant instructed her to do so. This testimony is additional circumstantial evidence of guilt.[6]

Moreover, T.B. testified that the victim told him that "Joe told [her] it was a secret between the two of [them]" and that "he [Joe] told her that if she said anything that she would be in big trouble." This threat was consistent with the victim's statement to Detective Kay during the forensic interview that appellant told her what he had done was a secret. Our case law is replete with examples of defendants, who committed sexual offenses against child victims, making similar threats or directives to the victims in an effort to ensure their silence. See Brown v. Commonwealth, 37 Va. App. 169, 171, 554 S.E.2d 711, 712 (2001) (Brown told victim "not to tell" because "she would get in trouble"); Santillo v. Commonwealth, 30 Va. App. 470, 481, 517 S.E.2d 733, 739 (1999) (Santillo told victim "not to tell anyone"); Tharrington v. Commonwealth, 2 Va. App. 491, 493, 346 S.E.2d 337, 339 (1986) (Tharrington told victim not to "tell anyone" or "she would get in trouble"). Appellant admitted during his interview with Detective Kay he had made a similar statement to the victim (i.e. it was "my secret"), although he stated he told the victim not to tell anyone he had allowed her to touch his tongue ring out of fear that he would get in trouble because his father does not like him having a tongue ring. The jury was entitled to infer that appellant lied to Detective Kay about the reason he told the victim

---

[6] Furthermore, a rational factfinder could certainly consider the mother's testimony that the victim's tights "were pulled down to her knees, the crouch [sic] part, and her underwear was pulled down in the back" as circumstantial evidence of appellant's guilt. This is particularly plausible given that the victim's mother testified that her daughter "is a chunky little thing, so [the tights] definitely fit," and the tights "didn't fall down before or after" this time.

to keep a secret in an effort to provide an innocent explanation for the damaging information the victim had provided police. See Rollston v. Commonwealth, 11 Va. App. 535, 547-48, 399 S.E.2d 823, 830-31 (1991).

During his interview with Detective Kay, appellant provided *three different explanations* of what occurred in an attempt to show that the victim was confused when she testified that appellant put his "weenie" in her mouth. He provided the tongue ring explanation, the explanation about her biting on the toy dragon while they were playing with it, and the story about how he had placed his thumb into her mouth to remove dust that had gotten into the victim's mouth from the ceiling fan while they were playing. At trial, he narrowed his list of explanations to one – the testimony that she had bitten the toy dragon while they were playing with it. Appellant's photo of the toy dragon, which was admitted at trial, does not support that explanation – or so a rational factfinder could have found. Moreover, "[t]he defendant's contradictory statements 'furnish bases for reasonable inferences that his explanations were made falsely in an effort to conceal his guilt.'" Sheppard v. Commonwealth, 250 Va. 379, 389, 464 S.E.2d 131, 137 (1995) (quoting Toler v. Commonwealth, 188 Va. 774, 782, 51 S.E.2d 210, 214 (1949)). A rational factfinder certainly could have reasonably disregarded appellant's various stories about the incident and, when weighing the evidence, have found the victim's testimony to be more credible. See Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998) (holding that the factfinder, "who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts").

Therefore, we cannot conclude that *no* rational factfinder could find that appellant put his penis in the victim's mouth, and, therefore, that the evidence is sufficient beyond a reasonable doubt that appellant committed forcible sodomy in violation of Code § 18.2-67.1.

III.  CONCLUSION

Accordingly, for the foregoing reasons, we affirm appellant's conviction for forcible sodomy in violation of Code § 18.2-67.1.

Affirmed.