COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Athey and Callins
Argued at Richmond, Virginia

CHRIS LEE THOMPSON STEVENS

MEMORANDUM OPINION* BY
v.        Record No. 0075-24-2          JUDGE CLIFFORD L. ATHEY, JR.
                                        JULY 22, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
William E. Glover, Judge

Lauren E. Brice, Assistant Public Defender (Virginia Indigent
Defense Commission, on briefs), for appellant.

Sabina B. Thaler, Assistant Attorney General (Jason S. Miyares,
Attorney General; Lauren C. Campbell, Assistant Attorney General,
on brief), for appellee.

Following a jury trial in the Circuit Court of Spotsylvania County ("trial court"), Chris

Lee Thompson Stevens ("Stevens") was convicted of numerous offenses in connection with the

death of his girlfriend, J.D.  On appeal, Stevens assigns error to the trial court: 1) for finding

S.D.[1] competent to testify; 2) for admitting S.D.'s testimony in evidence; 3) for admitting S.D.'s

recorded interview in evidence; 4) for admitting the statements of J.D. made to Deputy Walker;

and 5) for failing to strike Jurors 2 and 45 for cause.  For the following reasons, we affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] We use initials to protect the privacy of the juvenile and victim.

## I. Background[2]

In November 2021, Stevens was charged with two counts of abduction in violation of Code § 18.2-47, two counts for both violating a protective order and for possessing a firearm while under a protective order, both of which were in violation of Code § 16.1-279.1, and one count of murder in the first degree, in violation of Code § 18.2-32. The five charges were subsequently certified to the grand jury on April 6, 2022. Stevens was also directly indicted on two counts of felony child endangerment in violation of Code § 40.1-103, one count of statutory burglary with a deadly weapon in violation of Code § 18.2-90, and two counts of child abuse in violation of Code § 18.2-371.1(B).

By motion filed on February 6, 2023, Stevens challenged the competency of J.D.'s children (S.D. and E.D.), contending that neither child was competent to testify because they had contradicted themselves in prior interviews.[3] The Commonwealth contested the motion and also sought to introduce portions of the children's interviews at trial. The court preliminarily granted, in part, the Commonwealth's motion to admit the interviews at trial, but the motion was granted pending additional findings pursuant to Code § 19.2-268.3(B)(1)(c) at trial. Stevens's jury trial began on October 16, 2023.

---

[2] "On appeal, we review the evidence 'in the "light most favorable" to the Commonwealth, the prevailing party in the circuit court.'" *Womack v. Commonwealth*, 82 Va. App. 289, 292 n.1 (2024) (quoting *Konadu v. Commonwealth*, 79 Va. App. 606, 609 n.1 (2024)). "Doing so requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Konadu*, 79 Va. App. at 609 n.1). "To the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[3] On October 11, 2022, the Commonwealth moved, pursuant to Code § 18.2-67.9, for S.D. and E.D. to testify through the use of closed-circuit television. On February 6, 2023, Stevens objected and was overruled by the trial court on February 23, 2023. Stevens does not assign error to this ruling on appeal.

During voir dire, Stevens's attorney asked the venire if there was anyone "who has themselves or a close loved one, friend or family, experienced domestic violence?" Juror 2 responded in the affirmative, stating that the charges in this case were "eerily similar" to a situation that occurred in his life where his sister's boyfriend killed his sister and their child before the boyfriend committed suicide. Counsel then had the following exchange with Juror 2:

| | |
|---|---|
| [Counsel]: | I'm so sorry. So that's obviously a very significant event in your life and the life of your family. Is there anything about that with the facts alleged being so similar in this case that would cause you to kind of -- |
| [Juror 2]: | (Interjecting) I would hope not, but its's heavy right now, so . . . |
| [Counsel]: | Sure. The more we're talking about it . . . |
| [Juror 2]: | It's very personal. |
| [Counsel]: | The more -- okay. And obviously there's going to be more evidence and more testimony. |
| [Juror 2]: | It is what it is. |
| [Counsel]: | Right. So with that experience, which, again, I'm so sorry that you had, do you look at this case -- or would you as you hear this case be more likely to lean towards guilt because of the allegations here? |
| [Juror 2]: | I would hope not. |
| [Counsel]: | Okay. |
| [Juror 2]: | I hope I would be perfectly impartial, but I'm letting you know where I'm coming from. |

Counsel for Stevens later asked the venire if there was "anyone here who thinks that a man under no circumstances should ever hit or injure a woman no matter what?" Counsel for Stevens later rephrased the question, asking the venire if there was "anyone here who thinks that a man should never hit or make physical contact with a woman no matter what?" Juror 2 again responded in the affirmative, noting that he agreed with the statement because of "how [he] was raised." But when later asked if Juror 2's belief extended to the "context of someone defending themselves against an attack where they might be injured or killed," and if "that person would not be able to defend themselves if the person who was the aggressor was a woman," Juror 2 stated, "[w]ell,

- 3 -

that's a different circumstance, a different question." Counsel for Stevens clarified, "[p]utting it in the context of this particular case, let me say," to which Juror 2 replied, "[t]hen I'll sit back down."

Juror 45 also responded to the first question regarding if anyone had experienced domestic violence, noting that her first husband was "abusive" towards her. Juror 45 further stated that her husband would "get drunk and just, you know, beat on me, but it didn't get to the place where I had to go to the hospital or anything." In response, she was asked if—based on her experiences—there was "anything about that that would cause you to view this evidence in a way that you would find Mr. Stevens to be more likely guilty?" Juror 45 responded, "I don't think so, no." Counsel for Stevens then asked for Juror 45 to further explain her response, inquiring if Juror 45 could "just tell me why you think you wouldn't?" Juror 45 elaborated that it was "[b]ecause not all men are like that" and that she would "just have to hear the evidence and go based on that." Later, in responding to a question from Stevens's counsel about whether anyone in the venire was "involved as a volunteer or an advocate or an employee in a domestic violence advocacy organization or a victim-oriented organization around domestic violence," Juror 45 stated, "I know [sic] the member of the Fraternal Order of Eagles, and we do donate a lot of money to Empower House and domestic violence and children's charities." Counsel for Stevens noted that one of the Commonwealth's witnesses worked for Empower House and asked Juror 45 if "there [was] anything about that that you would tend to give that witness more credibility just because of her role?" Juror 45 responded, "No. I really didn't know anybody there. I just knew we donated money and toys and stuff."

Following voir dire, Stevens moved to strike Juror 2 for cause. Stevens's attorney contended that Juror 2 should be struck for cause because "[w]hen [she] asked the question about whether or not a man can ever hit a woman, he was very adamant about that." Counsel for

- 4 -

Stevens also noted that she "did follow-up with him about whether he could put that aside and listen to the facts in this case fairly, and I believe one of his statements was, [']I hope.['] I think that's equivocal." The Commonwealth objected to Juror 2 being struck for cause since Juror 2 had merely "stated that a man should never hit a woman unless it was self-defense," which therefore "rehabilitated him and he indicated he could be fair." The Commonwealth further objected to Juror 2 being removed for cause, reasoning that "[t]he only other thing that he mentioned was there was a murder-suicide in his close family" but that Juror 2 "didn't say anything about that other than it would be a little bit difficult." The trial court denied the motion to strike Juror 2 for cause, noting that Juror 2 "repeatedly said that he would be impartial." Steven's counsel responded, "[o]kay. Just note our objection."

Steven's counsel also moved to strike Juror 45 for cause, asserting that Juror 45 had

> made statements that her organization, [F]raternal [O]rder [of Eagles] does donations to Empower House, which is also going to be a significant witness in this case. And that connection is the same concern for [J]uror number twelve, that there is a support there, a connection there, there's a bias there about those particular witnesses and that organization.

The Commonwealth also objected to Juror 45 being struck for cause, contending that Juror 45 simply stated that her organization "donate[d] to many different nonprofits, including Empower House" and that Juror 45 disclosed that she had "never met any of the workers there at Empower House and indicated that she would have no problem being a neutral witness concerning those donations." The court opined that Juror 45 had said "she would not be biased" and denied the motion to strike Juror 45 for cause as well. Juror 2 was subsequently peremptorily struck by Stevens, but Juror 45 was empaneled as a member of the petit jury.

Following the jury being empaneled and sworn but prior to returning from recess to hear opening statements, counsel for Stevens objected to Spotsylvania Sheriff's Office Deputy John B. Walker's ("Deputy Walker") testifying concerning any statements made by J.D. to

- 5 -

Deputy Walker. In support, counsel for Stevens contended that any statements made to Deputy Walker by J.D. were hearsay not subject to an exception and further that the statements violated the Confrontation Clause of the Sixth Amendment because the statements were testimonial. Following oral argument, the trial court ruled that the statements could not be referenced during opening statements but that the trial court would decline to rule on the admissibility of the statements until "a contemporaneous objection" was made when Deputy Walker was called to testify as a witness.

Following opening statements, Deputy Walker was sworn and testified that he responded to a residence in Spotsylvania County on November 26, 2021. When he arrived at the residence, he observed J.D. and S.D. standing by a car outside of the house. Deputy Walker observed that J.D. appeared "visibly upset," that her "hair was a mess," that she was crying, and "shaking a little bit." The Commonwealth asked Deputy Walker if J.D. told him "why you were called there?" Deputy Walker testified in response that J.D. had told him that "her boyfriend was . . . in the house with her son, they had had a verbal argument and she was trying to get her son out of the house." Deputy Walker also testified that J.D. told him that "[t]he children were not his, and she was trying to leave the area due to her being upset and the verbal argument." The Commonwealth next asked Deputy Walker if J.D. had said "whether Mr. Stevens had put his hands on her?" At this point, counsel for Stevens objected, "on the same hearsay grounds and confrontation grounds" as before. The trial court opined that "[b]ased on the testimony of the officer at this point the testimony that's being offered is nontestimonial and, otherwise, not prohibited by the hearsay rule based on the prior argument of counsel." Deputy Walker then testified that when J.D. "initially talked to [Deputy Walker], she stated that it was verbal. When I began to talk to her further she said during the argument he jerked her hair and then stabbed the

- 6 -

bed with a knife." Deputy Walker then testified to the existence of a protective order between Stevens and J.D., a copy of which was admitted without objection.[4]

The jury was then excused, and outside of their presence, the Commonwealth played a short video clip of Deputy Walker's body-worn camera footage for the trial judge. During the video recording, Deputy Walker asks J.D. if she was planning to go back inside the house, to which J.D. answers, "No." She then confers with Deputy Walker about potentially getting a phone charger from the house and ensuring that the residence was secured. J.D. then says, "I'm not coming back here until I know for sure he's not coming back." Counsel for Stevens re-raised his earlier objections to the admission of the video recording on hearsay and Confrontation Clause grounds, asserting that "we're outside the excited utterance exception for hearsay, as well as the present sense impression." The trial court ruled with "absolutely no hesitation" that J.D.'s statements were an excited utterance because the statements "follow[ed] the allegation that she had been attacked in her residence by the defendant." The trial court also held that J.D.'s statement was nontestimonial because Deputy Walker and J.D. were "having a conversation about whether the door is locked and whether she's afraid to go back in because of what had just happened." The jury returned, and following the video recording being entered into evidence, the video recording was played for the jury. Deputy Walker then testified that J.D. "would not go back in" the house, even after law enforcement had determined that Stevens was not inside.

Deputy Walker also testified, without objection, that J.D. "said she planned on leaving, even if he wasn't there, she wasn't coming back." Deputy Walker further described entering the house and arriving in the bedroom where "[J.D.] made statements about [Stevens] pulling her

_____

[4] The protective order lists J.D. as the petitioner and Stevens as the respondent, and Stevens was ordered to "not commit acts of family abuse or criminal offenses that result in injury to person or property" and was allowed to have only "peaceful contact" with J.D. The order shows that it was issued on November 10, 2021, and Stevens was served that day at 12:03 p.m.

hair and stabbing the bed," which led Deputy Walker to ask J.D. where the bed had been stabbed. Deputy Walker then testified that there was a "one-inch mark" on the bedsheet and the "knife [was] on the bookshelf." In addition, Deputy Walker testified, again without objection, that he remained at the scene with J.D. because "she was fearful" and "wanted someone to stay there while she got her stuff." Finally, Deputy Walker testified that he obtained warrants for domestic assault and battery and violation of the protective order against Stevens.

The Commonwealth called additional witnesses on its behalf. In addition, both parties asked questions of S.D. concerning her competency to testify before she was permitted to testify in the presence of the jury. Responding to the questions, S.D. began by spelling her first name, stating that she was in the first grade and that she lived in "Earliesville." When asked if she meant "Charlottesville," S.D. replied, "I don't know." She also stated that she had a 10-year-old dog named Apollo and that she went to school at "The Bob Cat School." S.D. was able to correctly provide the name of her kindergarten teacher, her current teacher, and her favorite subject in school. The Commonwealth further asked S.D. who had brought her to court, and she responded that her dad's girlfriend, Karen, had transported her to the courthouse. The Commonwealth next asked, "if someone said that [one of your teachers] brought you today, would that be a truth or a lie," to which S.D. responded, "A lie." S.D. further agreed that it was "a bad thing" to tell a lie, that she "might get in trouble" if she told her father a lie, and that she could be punished. She also agreed that if she called a pink marker blue, that statement would be a lie, but if she said that the pink marker was pink, then that would be the truth. She affirmed that it was a "good thing" to tell the truth and answered yes to the question, "if we asked you to promise today to only tell the truth about questions that you're asked, you could do that?" When asked if she could "promise to tell the truth" and to "only say things that you remember," S.D. responded that she wasn't sure if she could keep that promise because she wasn't sure what to do

if she didn't remember something. But after prompting from the Commonwealth, S.D. agreed that she would be comfortable with saying "I don't know" if she didn't know the answer to a question.

Stevens's attorney asked S.D. her birthday, which she stated accurately. When asked again if she could "make a promise to tell the truth," S.D. said, "No. I'm very bad at telling secrets." Stevens's attorney asked if there were "times when [S.D.] didn't keep a promise and . . . lied?" S.D. responded in the affirmative but said that doing so was a "bad" thing. S.D. explained that a "promise is when somebody tells you to do something and you have to do the thing."

Following oral argument, the trial court noted that S.D. was "well aware of the difference between a truth and a lie" and that she also was "keenly aware of the fact that it's good to tell the truth and wrong to tell a lie." The trial court then ruled that based on S.D.'s answers it had "absolutely no question whatsoever that" S.D. was "competent to testify."[5]

During direct examination, S.D.'s initial testimony included answers of "I don't know." She was also unable to testify in significant detail regarding the events surrounding her mother's death. On cross-examination, S.D. said that her "dad" told her that if she didn't know what to say then to just say, "I don't know" and that her dad's girlfriend told her to say, "I forgot."

Prior to the Commonwealth entering any portion of S.D.'s previous interview in evidence, the trial court denied Stevens's motion *in limine*, holding that the interviewer was credible. Then the Commonwealth entered a video recording of the forensic interviews of S.D. and E.D. in evidence and played S.D.'s and E.D.'s forensic interviews for the jury. The

_____

[5] E.D.'s competency was also evaluated outside the presence of the jury, and the trial court likewise found him competent to testify. Once E.D. was evaluated by the trial court, Stevens abandoned any challenge to his competency and likewise does not challenge E.D.'s competency on appeal.

Commonwealth then rested its case. Counsel for Stevens moved to strike the Commonwealth's evidence, which was denied by the trial court. Stevens then testified in his own defense, claiming that he acted in self-defense in causing the death of J.D. At the conclusion of all the evidence, counsel for Stevens renewed his motion to strike, which was denied.

After the trial court ruled on Stevens's motion, the jury was instructed by the trial court with respect to the law applying in the case. Following closing statements, the jury retired to deliberate. The jury subsequently returned with its verdict finding Stevens guilty of second-degree murder, guilty of two counts of abduction, guilty of violating a protective order while armed, guilty of violating a protective order, and guilty of two counts of child cruelty. Stevens was also found not guilty of assault and battery, not guilty of two counts of child abuse, and not guilty of statutory burglary. Following a sentencing hearing on December 15, 2023, Stevens was sentenced to a total of 75 years and 12 months' incarceration and ordered to register with the sex offender registry upon his release. No time was suspended. Stevens appealed.

## II. ANALYSIS

### A. *Standard of Review*

The Supreme Court of Virginia has held that "the whole question of competency is largely left to the discretion of the trial court, and that its judgment will not be reversed except for manifest error." *Carpenter v. Commonwealth*, 186 Va. 851, 864 (1947). "Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"Juror impartiality is a question of fact." *Goodwin v. Commonwealth*, 71 Va. App. 125, 136 (2019). "[W]hen conducting appellate review on [a] question of fact, . . . the trial court's [finding] must be affirmed unless it is plainly wrong or without evidence to support it." *Sheppard v. Commonwealth*, 250 Va. 379, 387 (1995). "On appellate review, this Court gives deference to a trial court's decision whether to exclude a potential juror for cause." *Roberts v. CSX Transp., Inc.*, 279 Va. 111, 115 (2010). Therefore, "a trial court's denial of a motion to strike a juror for cause 'will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" *Townsend v. Commonwealth*, 270 Va. 325, 329-30 (2005) (quoting *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001)).

B. *The trial court did not err in finding that S.D. was competent to testify, nor did it err in admitting in evidence both her testimony and her recorded interview.*

Stevens first assigns error to the trial court for determining that S.D. was competent to testify, further contending that S.D. "lacked the capacity to independently recall and communicate events or to understand the duty to be truthful." The Commonwealth responds by asserting that "S.D. clearly demonstrated the understanding of the difference between the truth and a lie, and that she could face repercussions for telling a lie." We agree with the Commonwealth.

"In general, '[a] court may declare a person incompetent to testify if the court finds that the person does not have sufficient physical or mental capacity to testify truthfully, accurately, or understandably.'" *Bista v. Commonwealth*, ___ Va. ___, ___ (Nov. 14, 2024) (alteration in original) (quoting Va. R. Evid. 2:601(b)). Code § 8.01-396.1 provides that "no child will be deemed incompetent to testify solely because of age."

> There is no specific age at which a child must have arrived in order to be competent as a witness. A child is competent to testify if it possesses the capacity to observe events, to recollect and communicate them, and has the ability to understand questions and

> to frame and make intelligent answers, with a consciousness of the
> duty to speak the truth.

*Cross v. Commonwealth*, 195 Va. 62, 64 (1953).  The trial court must also consider the "child's age, his intelligence or lack of intelligence, and his sense of moral and legal responsibility." *Greenway v. Commonwealth*, 254 Va. 147, 153 (1997) (quoting *Hepler v. Hepler*, 195 Va. 611, 619 (1954)); *see, e.g.*, *Ortiz v. Commonwealth*, 276 Va. 705, 720-21 (2008) (upholding a court's competency determination for a nine year old who "explained the difference between the truth and a lie").  "The competency of a witness to testify is a determination to be made by the trial judge based upon the circumstances before him."  *Durant v. Commonwealth*, 7 Va. App. 454, 462 (1988).

Here, we cannot find a manifest error in the trial court's determination that S.D. was competent to testify.  As to her intelligence and age, S.D. was six years old at the time of trial, was able to spell her first name, state that she was in the first grade, say what her favorite subject was, state her birthday, give the name and age of her dog, and provide the names of her former and current teachers.  Although S.D. failed to provide completely accurate answers to questions about where she lived and the name of her school, this alone is not sufficient to support Stevens's contention that no reasonable jurist could have found that S.D. was intelligent enough to testify.

As to her sense of moral and legal responsibility, and her consciousness of her duty to speak the truth, S.D. was able to distinguish between the truth and a lie and clearly testified that it was a "bad thing" to tell a lie and that she could get in trouble and be punished for telling a lie.  She also noted that it was a "good thing" to tell the truth and responded in the affirmative when asked if she could promise to tell the truth, especially after clarifying that she could say "I don't know" when she didn't remember something.  When asked on cross-examination if she could "make a promise to tell the truth," S.D. said, "No.  I'm very bad at telling secrets."  Despite this, S.D. was still able to say that her difficulty in telling the truth was a "bad" thing.  *Ortiz*, 276 Va.

at 720-21. In fact, the trial court noted that S.D. was "well aware of the difference between a truth and a lie" and that she also was "keenly aware of the fact that it's good to tell the truth and wrong to tell a lie." In addition, although any difficulty that S.D. had in telling the truth was ripe for cross-examination by counsel for Stevens, any such difficulty was not so great that the circuit court abused its discretion in finding that S.D. was aware of her legal and moral obligations to speak the truth. Like any other witness, S.D.'s answers qualified her to serve as a competent witness, but the veracity of her statements themselves remained entirely within the jury's purview.

As to her capacity to observe events and to recollect and communicate them, S.D.'s initial testimony did contain numerous answers of "I don't know." In addition, she did not testify in any great amount of detail. However, on cross-examination, S.D. revealed that her "dad" had told his daughter that if she didn't know what to say then to just say, "I don't know," and that her dad's girlfriend told her to say, "I forgot." Accordingly, based on our review of the record, we cannot find that the court's exercise of its discretion to find S.D. competent was a manifest error. *Durant*, 7 Va. App. at 462.[6]

Turning to the admission of S.D.'s forensic interview, counsel for Stevens contends that since "S.D. was erroneously allowed to testify at trial" and since admitting her interview "was based on this error," the admission of the forensic interview was in error. As noted above, because we find no error in the trial court's determination that S.D. was competent to testify at trial, we likewise find no error in the trial court permitting S.D.'s forensic interview to be admitted into evidence. Thus, we affirm the trial court.

_____

[6] As S.D. was competent to testify, we find no error in the trial court admitting her relevant testimony at trial.

- 13 -

C.  *Stevens's challenges to J.D.'s statements are waived because of the application of the same-evidence rule.*

Stevens contends that J.D.'s statements to Deputy Walker were testimonial hearsay that violated the Confrontation Clause.  Stevens further alleges that this error was not harmless.  The Commonwealth asserts in response that J.D.'s statements were not hearsay, but if they were, the statements are nontestimonial.  Finally, the Commonwealth asserts that even if the statements were inadmissible hearsay that violated the Confrontation Clause, any error was harmless.  The two statements at issue are J.D.'s first statement to Deputy Walker that Stevens "jerked her hair and then stabbed the bed with a knife" and her second statement from Deputy Walker's body-worn camera video clip where she stated, "I'm not coming back here until I know for sure he's not coming back."  We find that as a result of the application of the same-evidence rule, Stevens's assignments of error related to the admission of J.D.'s statements are thus waived.

"A party cannot avail itself of an objection to evidence if the party has, at some other time during trial, 'voluntarily elicited the same evidence, or has permitted it to be brought out by his adversary without objection.'"  *Nat'l Coll. of Bus. & Tech. Inc. v. Davenport*, 57 Va. App. 677, 690 n.16 (2011) (quoting *Burns v. Bd. of Supervisors of Stafford Cnty.*, 227 Va. 354, 363 (1984)).  An unsuccessful objection "to the admissibility of certain evidence [is] waived by the failure to object to the same evidence subsequently introduced."  *Philip Greenberg, Inc. v. Dunville*, 166 Va. 398, 404 (1936).  "The scope of the waiver goes further, however, for it also includes evidence dealing 'with the same subject,' evidence fairly considered to be 'of the same character,' as well as evidence 'similar to that to which the objection applies.'"  *Isaac v. Commonwealth*, 58 Va. App. 255, 264 (2011) (first quoting *Pettus v. Commonwealth*, 269 Va. 69, 79 (2005); then quoting *Combs v. Commonwealth*, 256 Va. 490, 499 (1998); and then quoting *Snead v. Commonwealth*, 138 Va. 787, 802 (1924)).  "[O]nce evidence of *particular facts* has been introduced without objection[,] the objection is properly deemed waived as to

- 14 -

those particular facts." Kent Sinclair, *The Law of Evidence in Virginia* § 2-3(c) (2023). "This same-evidence principle has . . . stood in roughly the same form for well over a century," and it "applies to criminal and civil cases." *Isaac*, 58 Va. App. at 260. "[T]he practical effect of the principle remains clear: 'Some courts so hold because the error is harmless, and others because the subsequent introduction of the same evidence is a waiver of the objection. Whether it be placed upon one ground or the other, the result is the same.'" *Id.* at 260-61 (quoting *N.Y. Life Ins. Co. v. Taliaferro*, 95 Va. 522, 523 (1898)).

Here, in response to the Commonwealth's question concerning whether J.D. told Deputy Walker that Stevens "had put his hands on her," Stevens objected, however the objection was overruled by the trial court. Deputy Walker then said that J.D. told him that "during the argument [Stevens] jerked her hair and then stabbed the bed with a knife." Later, without objection, during direct examination, Deputy Walker described entering the house and arriving in the bedroom where "[J.D.] made statements about [Stevens] pulling her hair and stabbing the bed," which led Deputy Walker to ask where the bed had been stabbed and to discover a cut in the bedsheet. Additionally, after Stevens initially objected to Deputy Walker's body-worn camera video being entered in evidence and played for the jury, Deputy Walker later testified that J.D. "said she planned on leaving, even if he wasn't there, she wasn't coming back." Deputy Walker also testified, without objection, that he remained on scene with J.D. because "she was fearful" and "wanted someone to stay there while she got her stuff." Since there was no objection to the subsequent testimony in the record and the evidence is of the same character as the evidence that was objected to before and on the same subject, Stevens waived his

objection to the trial court's ruling by failing to object to Deputy Walker's subsequent testimony.[7]

D. *The trial court did not err by failing to strike Jurors 2 and 45 for cause.*

The Commonwealth contends that Stevens failed to preserve his assignment of error relating to his objections to Juror 2 and Juror 45 for cause following voir dire. In support, the Commonwealth asserts that Stevens's argument during voir dire was that Juror 2 should be struck for cause *solely* because he said that a man cannot hit a woman, and he is thus limited to that sole ground. Similarly, the Commonwealth contends that the objection to Juror 45 is that she should have been struck *solely* because of the juror's donations to Empower House. Stevens responds that the Commonwealth's contention is based on an "overly restrictive view" of Rule 5A:18. In support, Stevens argues that because we review the entirety of the juror's voir dire and not isolated statements, "the entirety of the jurors' voir dire was preserved as problematic." We agree with the Commonwealth.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "Rule 5A:18 requires a litigant to make timely and specific objections, so that the trial court has 'an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals.'" *Brown v. Commonwealth*, 279 Va. 210, 217 (2010) (quoting *West v. Commonwealth*, 43 Va. App. 327, 337 (2004)). "Specificity and timeliness undergird the contemporaneous objection rule, [and]

---

[7] At oral argument, Stevens's counsel said that the objections at trial were "continuing." But this point was not raised in either of appellant's briefs before this court, nor is the argument supported by the law or the record. *See* Sinclair, *supra*, § 2-5(a) (stating that a continuing objection is noted "by asking that the record reflect that counsel stands firm in objecting to the evidence in question despite the fact that the initial objection or objections have been overruled").

animate its highly practical purpose." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (emphases omitted) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

Here, counsel for Stevens asked if there was anyone in the venire that thought that "under no circumstances" could a man "ever hit or injure a woman no matter what?" But when Juror 2 responded in the affirmative, counsel for Stevens then asked if Juror 2's belief extended to self-defense, to which Juror 2 responded that self-defense was a "different circumstance" and "s[a]t down." When moving the trial court to strike Juror 2 for cause, the only rationale given by Stevens was that Juror 2 was "very adamant" about a man not hitting or injuring a woman. In response, the Commonwealth noted that Juror 2 had been "rehabilitated" because he had stated that "a man should never hit a woman unless it was self-defense." Although the Commonwealth made brief mention of Juror 2's prior statements about his sister, Stevens did not press his objection on those grounds in front of the trial court. Accordingly, the trial court made no ruling on Juror 2's supposed disqualifications based on his exposure to or familiarity with domestic violence or homicide but solely based it on Juror 2's answer regarding self-defense.

Our Supreme Court's precedents on this issue guide us in rejecting Stevens's argument. In *Townsend*, the Supreme Court addressed a challenge to empaneling a petit jury where the appellant argued on appeal that "the trial court is required to independently review each member of the venire to determine if the seating of any juror would undermine the public's confidence in the judicial process, regardless of whether a party raises an objection to a juror or gives a reason for excluding that person." 270 Va. at 330. However, the *Townsend* Court, applying Rule 5:25, found that Townsend "never argued to the trial court that public confidence in the judicial

- 17 -

process would be undermined by seating" the challenged jurors.[8] *Id.* at 332. *Townsend* itself built upon *Blevins*, another case where the Supreme Court addressed questions that were preserved regarding a juror's "honesty and potential for bias," but it declined to address issues that "[were] not raised in the trial court." *Id.* at 332 (quoting *Blevins v. Commonwealth*, 267 Va. 291, 296 n.1 (2004)). The Supreme Court of Virginia's cases of *Townsend* and *Blevins* foreclose Stevens's attempt to evade the application of Rule 5A:18 to his arguments.

Stevens is correct that "a juror's entire voir dire must be considered before an appellate court will overturn the decision of a trial court to deny a motion to strike a juror for cause." *Goodwin v. Commonwealth*, 71 Va. App. 125, 139 n.10 (2019). But this principle of law was not enunciated in the context of Rule 5A:18 or our jurisdictional rules regarding preservation of issues. Rather, it concerns the situation where a juror's entire voir dire *was properly objected to*, the entirety of that juror's voir dire had to be reviewed in context without isolating certain statements made by the particular prospective juror. *See id.* at 144 (noting that Goodwin's analysis "isolates those words from the complete context of the voir dire" and that his argument "focuse[d] on specific words that [the jurors] used such as 'think' and 'believe'"). The Court faulted Goodwin for "ignor[ing] that the trial court considered the full statements of those jurors and their respective demeanors during questioning, and not just the specific words that he highlights on appeal." *Id. Goodwin*'s requirement to consider the entirety of a juror's voir dire therefore is not an end-around that skirts the requirements of Rule 5A:18. Therefore, we find that Stevens's challenge on appeal as to Juror 2's impartiality relating to domestic violence is waived under Rule 5A:18, and therefore we will not consider it. Stevens does not argue that Juror 2 was otherwise unfit to serve on the jury, and therefore we affirm the trial court's denial of Stevens's motion to strike Juror 2 for cause.

---

[8] Rule 5:25 is the Supreme Court of Virginia's counterpart to Rule 5A:18.

As for Juror 45, counsel for Stevens objected to her sitting on the jury because of her statements that the Fraternal Order of Eagles "donat[es] to Empower House" and that the "support" and "connection" there indicated the presence of "bias there about these particular witnesses and that organization." The Commonwealth noted that Juror 45 had "never met any of the workers there at Empower House and indicated that she would have no problem being a neutral witness concerning those donations." Juror 45's prior answers about her "abusive" husband were not addressed by Stevens and accordingly, the trial court did not rule on them. *See* Rule 5A:18; *Townsend*, 270 Va. at 322. Therefore, to the extent that Stevens argues that Juror 45's prior abusive experiences rendered her unfit to sit on the jury, this argument is also waived. Accordingly, we address the remaining preserved portion of Stevens's argument as it pertains to Juror 45's involvement with the Fraternal Order of Eagles.

Stevens contends that Juror 45's membership in the Fraternal Order of Eagles—a group that provides money to charities that help those seeking to escape abuse—renders her not impartial. We disagree.

A trial court must excuse for cause a potential juror who "has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice" regarding the action. *Spangler v. Ashwell*, 116 Va. 992, 996-97 (1914) (quoting *Richardson v. Planters Bank of Farmville*, 94 Va. 130 (1896)). If a potential juror has an opinion that "repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already," they must be disqualified. *Brown v. Commonwealth*, 68 Va. App. 746, 785 (2018). Likewise, a potential juror should be struck for cause when "the prospective juror's views 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Breard v. Commonwealth*, 248 Va. 68, 77 (1994) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 246 (1990)). "It is prejudicial error

for the trial court to force a defendant to use peremptory strikes to exclude a venireman from the jury panel if that person is not free from exception." *Townsend*, 270 Va. at 329.

Here, Juror 45 stated, "I know [sic] the member of the Fraternal Order of Eagles, and we do donate a lot of money to Empower House and domestic violence and children's charities." Counsel for Stevens noted that one of the Commonwealth's witnesses worked for Empower House and asked Juror 45 if "there [was] anything about that that you would tend to give that witness more credibility just because of her role?" Juror 45 responded, "No. I really didn't know anybody there. I just knew we donated money and toys and stuff." Based on Juror 45's responses, the trial court did not abuse its discretion in finding that Juror 45 would not give more credence to a particular witness who worked at Empower House. Juror 45 was merely a member of the Fraternal Order of Eagles, which in turn gave money to many charities, of which Empower House was one, and one of the Commonwealth's witnesses worked for that charity. But there were no facts in the record to suggest that this attenuated chain of transferring money in and of itself was significant or personal enough to disqualify Juror 45. This is especially evident when she made it clear that she did not know anyone who worked at Empower House and her association with it was strictly through the form of an organization she was a part of that gave an undisclosed amount of money to Empower House. Accordingly, the trial court did not abuse its discretion, and we affirm the trial court's denial of Stevens's motion to strike for cause Juror 45.

III. CONCLUSION

For the foregoing reasons, we affirm Stevens's convictions.

*Affirmed.*

- 20 -